No. 30,958.

JACK EDWARD LEE, a Minor, by J. H. GILBERT and MARION J. JOHANNES, as Next Friends, *Appellee*, v. THE KANSAS CITY PUBLIC SERVICE COMPANY and THE MEYER SANITARY MILK COMPANY, *Appellants*.

(22 P. 2d 942.)

Opinion filed June 10, 1933.

*Edwin S. McAnany, Maurice L. Alden* and *Thomas M. Van Cleave,* all of Kansas City, for appellant The Kansas City Public Service Company; *David F. Carson* and *O. Q. Claflin, Jr.,* both of Kansas City, for appellant The Meyer Sanitary Milk Company.

*Arthur J. Mellott, George E. Gard* and *Hugh E. Brownfield,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff, a minor, brought this action by next friends to recover damages for injuries sustained in a collision between a street car and a milk wagon which occurred at a street intersection in Kansas City on a wintry morning before daylight in January, 1931.

The defendant the Meyer Sanitary Milk Company was engaged in the distribution of milk. It owned teams and milk wagons and hired drivers to deliver milk throughout the city. With the knowledge and acquiescence of the milk company these drivers had a custom of hiring boys to accompany them on their routes to assist in the delivery of milk to customers. One of these drivers was Clinton Smith. The milk company furnished him with a team of mules and a wagon equipped to hold 600 bottles of milk. The wagon had a door on each side, and there were small panels of glass all around it, and a lantern was lit and hung inside. Smith's milk route was in the northwest part of the city, where Twenty-sixth street, which runs north and south, intersects the street railway of defendant the Kansas City Public Service Company, which runs east and west adjacent to and parallel with New Jersey avenue.

Immediately north of this intersection Twenty-sixth street slopes toward the south. On approaching this intersection from the north the view of a street car coming from the east is somewhat shortened owing to the contour of the intervening ground.

The plaintiff, who was about thirteen years and four months old, had resided with his grandfather since babyhood a short distance from this intersection. For several months he had been employed by Clinton Smith to help in distributing milk. Smith paid him fifty cents for each trip. Sometimes Smith also employed Bernie Bray, a boy of sixteen years. The latter was present on the occasion of present concern. The two boys arose about midnight and arrived at the milk company's plant about one o'clock. Plaintiff helped Clinton Smith hitch up the mules and load milk cases into the wagon. Smith and the two boys then set out to deliver milk.

The mules were well broken and taught to stop when the brake was set and to start when it was released. Smith delivered milk on the left side of the street and the two boys on the right. Coming south on Twenty-sixth street the team was stopped about twenty feet from the tracks of the street railway while Smith delivered milk on the east side of the street and the two boys on the west. Bernie Bray first returned to the wagon. About that time the brake was released and the mules started. Smith got in on the left side of the wagon, shutting the door with one hand and seizing the reins which hung overhead with the other. About the same time plaintiff reached the right side of the wagon and put one foot on the step as the team started to cross the railway track. About that time a street car which came from the east struck and upset the milk wagon. Plaintiff fell under it and was severely and permanently injured.

Plaintiff's petition recited the pertinent facts and charged both street-car company and milk company with negligence in various specified particulars.

The street-car company answered with a general denial and a plea of contributory negligence. It also alleged that plaintiff was engaged in a joint enterprise with the other occupants of the milk wagon and that the negligence of any of them was the negligence of all.

The milk company's answer contained a general denial and alleged that Clinton Smith had no authority to employ plaintiff, and—

"That any injuries plaintiff may have received were because of his own fault and neglect; that he climbed on the outside of defendant's wagon without the knowledge or consent of defendant, and assumed whatever risk might be incident to the position in which he was riding; that he could have alighted from the wagon in plenty of time to have avoided the injuries he complained of; that he loosened the brakes of the wagon which caused it to start before the driver was in place thereon, and thereby caused and directly contributed to any injuries he sustained."

In plaintiff's reply it was alleged—

"That if the driver had no specific authority to employ plaintiff, such employment was tacitly consented to by defendant milk company, and that the employment by said driver and others of various boys to assist in the delivery of milk for defendant was such a common practice that the milk company had actual or constructive knowledge and notice of such employment, and is estopped to deny the authority of its agent to employ plaintiff; that plaintiff had worked for Clinton Smith many times, and also for other drivers, all with full knowledge and consent of the milk company, and was so working at the time he was injured."

Jury trial.

The main features of the evidence were as outlined above. Other testimony, more or less controverted, was given by various witnesses. Curtis Kuhn was permitted to testify over objection that he arrived at the scene of the accident a very few minutes after it happened and that he heard the motorman say, "I didn't see the wagon until we hit." The driver of the milk wagon testified that plaintiff himself had released the brakes, which started the mules before he (Smith) had entered the wagon.

[COUNSEL FOR THE MILK COMPANY]: "Was the wagon or the mules, or what part of it, was on the tracks when you got on it there, after they started up from this point forty feet back? A. The mules were on the tracks.

"Q. Now, when you got on it, what did you do, if anything, by way of closing these doors? A. I shut the door on the left side; that is, the one on the east side of the wagon.

"Q. Now at that time did you do anything by way of looking to see if there was a street car coming? A. At that time when I shut the door I saw the street car.

"Q. Did you say anything then? A. I said, 'Look out! Here comes a street car.'

. . . . . . . . . . . . . . .

"Q. Now, how far were you away from it at that time? A. . . . . I should judge about thirty, forty feet, something like that.

. . . . . . . . . . . . . . .

"Q. I believe you said that you caught it just as the mules were on the track? A. Yes.

"Q. Now, when you saw the brakes released, who was it released them? A. Jackie. (Plaintiff.)

"Q. How did he release them? A. With his foot.

"Q. Now, did you get across that track? A. We did not. We got knocked across. We were not quite across, no."

"*Cross-examination:*

[COUNSEL FOR PLAINTIFF]: "Now, you stated that after you got in the left-hand side of the wagon and shut the door, then you saw the street car? A. Yes, sir.

"Q. How far away was the street car at that time? A. The street car was about forty or fifty feet away.

"Q. Could you see the motorman? A. Yes, sir.

"Q. Could you observe what he was doing? A. He was looking south.

. . . . . . . . . . . . . . .

"Q. Did you see anyone there in the front of the car besides the motorman? A. Yes.

. . . . . . . . . . . . . . .

"Q. Yes. Was he looking towards the other man? A. He was looking south on Twenty-sixth street.

. . . . . . . . . . . . . . .

"Q. How long did he continue to look that way? A. Well, about the time I saw him or just a little bit after that he saw us; he looked to the north."

John D. Layton, who was the only passenger on the street car, testified that he was riding in the front vestibule and saw the heads of the mules the instant they came within range of the street car's headlight as they entered on the railway track; that the street car was then twenty to twenty-six feet away; that instantaneously the air brakes of the street car were applied, and that the street car was stopped about four feet before it reached the west side of the pavement on Twenty-sixth street.

"Q. And as the car approached this intersection, what is the first thing you saw that attracted your attention—anything unusual? A. Well, I seen something in the beam of the headlight, that was the mules.

. . . . . . . . . . . . . . . . . . . .

"Q. . . . Now, when you saw them was there anything that attracted your attention with reference to the car? A. Yes, the air.
"Q. What was it? A. The air.

. . . . . . . . . . . . . . . . . . . .

"Q. The brakes went on? A. Yes.
"Q. . . . You were watching ahead on the track? A. Yes.

. . . . . . . . . . . . . . . . . . . .

"Q. In your judgment, at about what—how was the car running, what rate of speed was it approaching this intersection?

. . . . . . . . . . . . . . . . . . . .

"A. Well, I don't know much about speed of street cars, but it was running at a moderate speed."

Bernie Bray testified that he thought plaintiff released the wagon brake which started the mules. Nobody had hold of the reins. They were on a hook. As Smith got in he remarked that it was chilly and closed the door on the left.

"Q. Now, then, what is the next thing that you recall occurred? Just tell the court and jury. A. Well, Smith kind of yelled. He said, 'Look out,' and I looked over there, and there was a street car about ten feet off.
"Q. About ten feet off? A. Yes, sir; well, I don't know for sure; I guess it was about ten feet, because I just got a glance at it and then it hit us."

The jury returned a verdict for plaintiff for $15,000 against both defendants, and answered many special questions to the most significant of which space must be given:

"3. Was it dark at the time of the accident? A. Yes.
"4. How far distant in feet from the center of the paved portion of 26th street was the front end of the west-bound street car when the heads of the

mules entered over the north rail of the westbound track?   A.  About twenty-five feet.

"7.  How many feet east of the point of collision was the front end of the street car when Mr. Layton saw the team entering or on the north track? A.  About twenty-five feet.

"8.  Did the operator apply the air to the brakes the instant Mr. Layton first saw the team entering upon the north track?   A.  Yes.

"9.  How many feet did the street car run west beyond the point of collision? A.  About thirteen feet.

"10.  Did the motorman turn on the air to set the brakes before the collision? A.  Yes.

"11.  If you answer the foregoing question 'yes,' how many feet did the car run from the instant the brakes were put on until it came to a stop?   A. About thirty-eight feet.

"12.  Immediately before the mules started to cross the north track, had the plaintiff taken any precautions or sought in any way to ascertain whether a street car was approaching from the east?   A.  No.

"13.  If you answer the foregoing question 'yes,' state specifically what precautions he took before the mules started across the track.   A.  None.

"14.  What was there at any time before the wagon was struck by the street car that prevented the plaintiff from stepping from the wagon on to the ground before getting on the north track?   A.  No knowledge of danger.

"15.  At the time of the accident (a) was the plaintiff a bright, intelligent boy, (b) familiar with the Twenty-sixth street crossing, and (c) with the danger of crossing trolley tracks without ascertaining whether cars were approaching the crossing?   A.  (a) Yes.  (b) Yes.  (c) Yes.

"16.  If you find a verdict against defendant Kansas City Public Service Company, state specifically each act of negligence on its part that caused or contributed to plaintiff's injury.   A.  *Inattention to duty on part of operator.* Operator was not looking ahead. [Italicized words stricken out by trial court.]

"18.  Did Jack Edward Lee for a long time prior to and on the 3d day of January, 1931, know that street cars passed and repassed frequently on said tracks across said intersection?   A.  Yes.

"19.  Did Jack Edward Lee for a long time prior to and on the 3d day of January, 1931, know that owl cars passed and repassed hourly on said tracks across said intersection?   A.  No evidence to prove that he did.

"20.  Was the team of mules hitched to the wagon of the defendant the Meyer Sanitary Milk Company gentle and trained to start and stop when the brake was released or set upon said milk wagon?   A.  Yes.

"22.  Had Jack Edward Lee on many occasions prior to January 3, 1931, (a) set said brakes and released the same on said milk wagon, and (b) knew that said team would stop and start when said brakes were set or released? A.  (a) Yes, under driver's supervision.  (b) Yes.

"23.  Was said team stopped on the morning of the 3d day of January, 1931,

within ten or fifteen feet of the westbound track of the street-car company by the setting of the brakes thereon? A. Yes.

. . . . . . . . . . . . . .

"29. Was the plaintiff, Jack Edward Lee, upon the step on the right-hand side of the milk wagon at the time the brake was released? A. Yes.

"30. What precautions, if any, do you find that Jack Edward Lee took for his own safety at any time prior to the time that the collision occurred? Answer fully. A. None.

"31. Did the driver of said milk wagon, Clinton Smith, see the street car of the defendant the Kansas City Public Service Company when it was forty or fifty feet from him? A. No.

. . . . . . . . . . . . . .

"33. Was the Meyer Sanitary Milk Company guilty of any negligence which caused or contributed to the plaintiff's injuries? A. Yes.

"34. If you answer question No. 33 'yes,' then state fully of what such negligence consisted. A. *Inattention of driver to full performance of duty.* Driver did not have hold of lines and did not look out before going over the crossing. [Italicized words stricken out by the trial court.]

. . . . . . . . . . . . . .

"37. Did the motorman say after the collision, 'I did not see the wagon until we hit,' in words or substance? A. No direct evidence.

"38. If you answer question No. 37 by 'yes,' could the milk wagon have gotten safely across the tracks if the motorman had seen it when it entered upon the tracks and used the means at his command to check the speed of the same? A. No direct evidence.

"39. Was there a custom of drivers of the Meyer Sanitary Milk Company enlisting the aid of young boys in making deliveries from the trucks and wagons? A. Yes.

. . . . . . . . . . . . . .

"41. If you answer question numbered 39 'yes,' was such custom known to the foreman or other officers of the Meyer Sanitary Milk Company? A. Yes.

"42. Was plaintiff upon the milk wagon with the full knowledge and consent of the driver? A. Yes.

"43. Did the mules start forward while plaintiff was in the act of boarding the wagon? A. Yes.

"44. Who, if anyone, had hold of the lines? A. No one.

"45. How much time elapsed from the time plaintiff stepped on to the step of the wagon before the collision occurred? A. Few seconds."

The street-car company moved to set aside special findings 9, 11, 14, 16 and 19 as contrary to the evidence, contradictory to and inconsistent with each other, unsupported by the evidence, and inconsistent with the general verdict. The motion was sustained in part so far as it pertained to special finding 16. A similar ruling was made as to special finding 34. In all other respects the motion was overruled. Motions of both defendants for judgment on the special

findings and for a new trial were overruled, and judgment for plaintiff was entered on the verdict against both defendants. Hence these appeals.

Considering first the errors urged by the street-car company, it will be noted that its negligence which contributed to plaintiff's injury, as found by the jury, was that the operator of the street car was not looking ahead. (Special finding No. 16.) The effect of this finding was to exonerate the street-car company of all other allegations of negligence contained in plaintiff's petition. (*Brim v. Atchison, T. & S. F. Rly. Co.*, 136 Kan. 159, 12 P. 2d 715; *Roberts v. St. Louis & S. F. Rly. Co.*, 136 Kan. 749, 759, 18 P. 2d 167.) The street-car company contends that there was no evidence to support this finding. It was based on the testimony of the driver of the milk wagon that he saw the street car when it was 30 or 40 feet away—40 or 50 feet according to his cross examination—and that he observed the motorman looking south, toward the other man in the vestibule. That the motorman was looking south was the only fact testified to by the driver which the jury believed. (Finding 31.) However, as the jury did believe that the motorman was looking south—that he was not looking ahead at the moment the driver saw him—this court must accept that finding as true.

But how did that fact establish the negligence of the motorman and consequently of his employer, the street-car company? The jury found that the street car was only 25 feet away when the heads of the mules came into view as they entered the railway track (findings 4 and 7), and that the air brake was applied instantly (finding 8) so that the street car was brought to a full stop in 38 feet. (Findings 11 and 9.) From these findings of fact another question intrudes: If the motorman had been looking ahead instead of toward the south, as the wagon driver testified and as the jury found, just what could he have done to have averted the collision that he did not do? If he had been looking ahead he would have applied the brakes, but he did apply them the instant the heads of the mules appeared within the range of the headlight. And he brought the street car to a stop within 38 feet. Even the jury itself avoided an affirmative answer to the all-controlling question whether something the motorman failed or delayed to do would have checked the speed of the street car and thereby averted or minimized the collision. (Special Q. and A. 38.) It is, therefore, apparent that no negligence on the part of the street-car company was established; the jury's special findings acquitted it of negligence notwithstand-

ing their general verdict; and the judgment entered against it must be set aside.

Passing next to the errors urged on our attention by the defendant milk company: It first directs our attention to the pleadings. In the petition plaintiff alleged:

"Prior to the accident to the plaintiff he had done considerable work for the milk company and its agents by assisting in the delivery of its products. For many months prior to the accident to plaintiff a custom had existed among the drivers of the milk company, with its full knowledge and consent, or for such a length of time that the milk company had actual or constructive knowledge and notice thereof, of enlisting the aid of young boys in making deliveries to homes served with the company's milk, cream and dairy products."

The milk company's answer traversed the allegations of the petition and alleged that plaintiff was injured through his own fault. It also alleged:

"That Clinton Smith never had authority to employ Jack Edward Lee, Smith being merely a driver of one of defendant's wagons."

At the trial plaintiff testified, on cross-examination, that he worked for the milk company during the summer of 1930 and continued to do so until the time he was hurt, on January 3, 1931. However, other evidence elicited the circumstances of plaintiff's employment. Plaintiff was not on the milk company's pay roll. It employed the drivers of the milk wagons, furnished them with teams, wagons and milk. The drivers employed the boys to assist them in delivering the milk and paid them 50 cents per trip for their services. The milk company knew of and acquiesced in this arrangement. It was pursuant to this arrangement that plaintiff assisted Smith in the delivery of milk; and, indeed, when Smith was on vacation for two weeks, Smith's superior, Thayer, who was foreman of the milk company and boss of the drivers, took Smith's place in delivering milk, and plaintiff made the rounds with Thayer as he was accustomed to do with Smith.

In view of the pleadings and this evidence the defendant milk company contends that any liability it owed to plaintiff would be governed by the workmen's compensation act and not under the general law of liability for negligence.

Touching this point it must be noted that no such suggestion was made in the pleadings. Defendant argues, however, that it is not necessary to plead matters of law; that it is sufficient for the pleadings and evidence to develop the facts, and the court will apply the

pertinent law. But how does that rule apply here? The facts disclosed that plaintiff was thirteen years and four months old when this accident happened. The work in which he was engaged was performed in the nighttime. He arrived at the milk plant about 1 o'clock a. m. The milk plant was a kind of factory where machinery was used. He helped load the milk. Then he started out with the wagon driver to deliver milk about the city, and was so engaged when this accident occurred about 5 o'clock a. m., which was before daylight. (Finding 3.) The child-labor act, in part, reads:

"That no child under fourteen years of age shall be at any time employed, permitted or suffered to work in or in connection with any factory, workshop, theater, mill, cannery, packing house, or operating elevators, . . ." (R. S. 38-601.)

It may be inferred that the milk company's business was operated under the workmen's compensation act unless the proprietor had taken affirmative steps to exempt it from its provisions. Indeed, this is the inference defendant desires this court to draw from the silence of the record. But it is perfectly obvious that owing to plaintiff's age he could not be lawfully employed *in the nighttime* around a milk distributing plant. Moreover, the compensation act defines a workman as a person who works for an employer under a contract of service or apprenticeship (R. S. 1931 Supp. 44-508 [i]), and no contract of service or apprenticeship existed between plaintiff and the milk company. It must therefore be held that the trial court correctly ruled out all consideration of the compensation act. But it would not necessarily follow, however, that the relation of master and servant could not exist between plaintiff and the milk company, although that relationship could not be governed by the compensation act. (*Casteel v. Brick Co.*, 83 Kan. 533, 112 Pac. 145; *Brown v. Railway Co.*, 104 Kan. 505, 507, 180 Pac. 211; *Western Union Tel. Co. v. Ausbrooks*, 148 Tenn. 615, 33 A. L. R. 330 and note. See, also, 14 A. L. R. 819; 49 A. L. R. 1436; 60 A. L. R. 848.)

In 28 R. C. L. 766 it is said:

"If a minor employee, who has been engaged in the service of the employer in violation of the child-labor law, can show that an injury sustained by him was attributable to the fault of his employer, he is entitled to his action at law; but while there is authority apparently to the contrary, according to the prevailing view he is not entitled to claim compensation, where it appears that he was . . . under the statutory age."

Just what was the status of plaintiff with respect to the defendant

milk company? The company knew of his employment by the wagon driver. It was a general custom for the drivers to employ boys like plaintiff. It was a fair inference from the evidence that this custom was part of the company's general plan for getting its milk distributed to its customers. The fact that plaintiff was paid by the driver and not by the milk company was not of controlling significance. Certainly plaintiff was not a trespasser on defendant's milk wagon, nor a mere licensee. (45 C. J. 740, 788.) Under the working arrangement between plaintiff and the driver, which had the tacit consent and acquiescence of the milk company, plaintiff was an invitee to whom the milk company owed the common-law duty of reasonable care. (45 C. J. 808-810; id. 825-826.) A closely analogous case to the one at bar was *Dyer v. McCorkle,* 208 Cal. 216, where the defendant corporation was engaged through its employees in delivering milk in the city of Fresno. One of these employees used an electric truck. He instituted the practice of enlisting the aid of small boys in making deliveries to the homes served with milk by the defendant company, paying them therefor by small sums of money and gifts of candy. For some time prior to April 11, 1926, plaintiff, a twelve-year-old lad, had been accompanying this employee in his rounds, delivering milk in bottles to homes on one side of the street while the truck driver delivered them on the other. When the driver would return to the truck before plaintiff he would start it, and plaintiff would overtake it and jump on the running board, holding on by an upright bar while the truck was in motion. On one occasion, while jumping on the running board, plaintiff fell and was run over and injured. In the action for damages which followed it was not so clear as in the case at bar that the defendant was aware of its truck driver's custom of employing boys in this fashion, but the court held that it was a jury question. In affirming the judgment against the employer of the truck driver the California supreme court defined the status of plaintiff as that of an invitee, and held:

"In this action for damages for personal injuries suffered by plaintiff, a minor, as the result of a fall while endeavoring to jump to the running board of a milk truck of defendant corporation, if plaintiff, in attempting to board the truck, was there with the consent of defendant corporation or with the consent of its driver having authority, either express or implied, to grant the privilege, he was an invitee and was entitled to ordinary care at the hands of the driver, and the omission in this particular would be binding upon defendant corporation if, at the time of infliction of the injury, the driver was engaged

in accomplishing an object in the line of the duties assigned to him by defendant corporation." (Syl. ¶ 1.)

Among the pertinent cases cited in support of its judgment in the case just mentioned was *Purtell v. Philadelphia Coal Co.*, 256 Ill. 110, 43 L. R. A., n. s., 193. In that case the appellant company had a coal yard in Chicago in which it employed fourteen workmen. For many years these employees had been accustomed to employ a water boy, and they paid him out of their own wages. Plaintiff, a boy under twelve years of age, had been thus employed for a short time when he was injured by a swinging boom. In affirming a judgment in his favor against the owner and operator of the coal yard, the court said:

"The owner of premises owes no duty to exercise care to keep his premises in a reasonably safe condition to a person who may be there as a mere licensee. (*Pauckner v. Wakem*, 231 Ill. 276, 14 L. R. A., n. s., 1118, 83 N. E. 202, and cases cited.) If, however, such person is there by the invitation, express or implied, of the owner, then such owner owes him a duty to exercise ordinary care to keep the premises in reasonably safe condition. When a person is upon premises by implied invitation, it means he is there for a purpose connected with the business in which the owner of the premises is engaged or which he permits to be carried on. (*Plummer v. Dill*, 156 Mass. 426, 32 Am. St. Rep. 463, 31 N. E. 128.) The evidence in this record shows plainly that for many years there has been a custom, which must have been well known to those in charge of appellant's yard, for the car pushers and others, in their work of handling coal, to employ a boy as a water carrier, who kept them supplied with water, and who sometimes, at the request of such employees, was expected to go for beer. In *Atkins v. Lackawanna Transp. Co.*, 182 Ill. 237, 54 N. E. 1004, this court held that where the owners of a vessel engaged in carrying merchandise permitted a boy on said vessel for the purpose of supplying its employees with drinking water, he being hired by such employees for that purpose, such owners must exercise reasonable care towards such boy while he was on the vessel. In *Illinois C. R. Co. v. Hopkins*, 200 Ill. 122, 65 N. E. 656, it was held that one going to a railroad depot to deliver meals to mail clerks on a train, in accordance with an agreement between her and such mail clerks, where such practice had been followed for years with the knowledge and consent of the railroad company, was not a mere licensee upon the depot platform, but must be regarded as there by the implied invitation of said railroad company." (p. 114.)

Our own case of *Swan v. Riverside Bathing Beach Co.*, 132 Kan. 61, 294 Pac. 902, was quite different except in respect to the duty owed to children who are invited to come about the property of a defendant. On that point this court ruled:

"Ordinary care with respect to children who have not reached the age where they are able to understand, appreciate and avoid danger, may include

a duty to take precautions to protect them, which would not be necessary in case of adults or older children, but the owner or operator of a place to which children are invited is not ordinarily an insurer of their safety and can be held liable only when he has been guilty of negligence involving a breach of duty owed to such children." (Syl. ¶ 2.)

Counsel for the milk company cite *Mayhew v. DeCoursey*, 135 Kan. 184, 10 P. 2d 10. Without attempting nice distinctions, it should suffice to note that in that case the boy was riding on defendant's truck in disobedience of the master's orders, while in this case the boy was riding on the employer's milk wagon pursuant to a long-standing custom acquiesced in by the milk company and he was actually engaged in furthering its business.

It is next contended that the uncontroverted evidence, as well as the jury's special findings, particularly Nos. 15, 18 and 30, established plaintiff's contributory negligence. Cases are cited which hold that boys of average intelligence, although not held to the standards of care for their own protection required of adults, are required to exercise such a degree of care as is reasonably to be expected of one of their years. (*Bellamy v. Railways Co.*, 108 Kan. 708, 710, 196 Pac. 1104; notes in 11 L. R. A., n. s., 166-174; L. R. A. 1917F 172-187.) Appellant contends that a just application of this rule required the trial court, either on the demurrer to plaintiff's evidence or on the motion for judgment on the special findings, to hold plaintiff guilty of contributory negligence. Of course the evidence did show that plaintiff took no precautions for his own safety, but the peculiar circumstances should not be overlooked. He testified that he had just reached the milk wagon as the mules started; the milk wagon was between him and the on-coming street car so that he could not see it; he had merely put his foot on the step, and was only in the act of getting inside when the collision occurred. He frankly admitted he knew of the danger of crossing without being assured that no street car was coming, and he always made it a point to look before he went across, if possible.

"Q. Before you would start on? A. If possible. Like if I was in a hurry or something, I would not pay no attention, because the driver is supposed to look out for that."

In such a situation it cannot be declared as a matter of law that this thirteen-year-old boy was guilty of contributory negligence because he did not wait until after the milk wagon had crossed the railway track before he put his foot on the wagon step, or because in

this instance he relied on the wagon driver to look out for the street car, as he was supposed to do. We think it was a jury question whether plaintiff's attempt to board the wagon under the circumstances constituted contributory negligence. (*Bellamy v. Railways Co.*, supra; note in 14 A. S. R. 590-596.)

It is also contended that error inhered in instruction No. 6—too lengthy for reproduction here—in that it assumed that a custom existed among the milk company's drivers of enlisting the aid of boys to deliver milk. Fairly read, the instruction merely summarized the allegations of plaintiff's petition touching this custom and defendant's knowledge of it and defendant's notice and knowledge that plaintiff was so engaged by the milk-wagon driver, and the legal consequence which would attach thereto if the jury found the facts as alleged. The criticism of this instruction is illfounded, and the error assigned thereon cannot be sustained.

This court is aware of the gravity of this case to the milk company, but after a careful review of the record and a patient study of the legal questions raised by its counsel, we are compelled to hold that no prejudicial error is made to appear, and the judgment against it must therefore be affirmed.

Reversed as to the Kansas City Public Service Company, and affirmed as to the Meyer Sanitary Milk Company.