No. 33,931

PAUL JONES, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

(85 P. 2d 15)

Opinion filed December 10, 1938.

*Bruce Hurd, C. J. Putt, Robert M. Clark,* all of Topeka, *Chester Stevens,* of Independence, and *E. J. Taggart,* of Wellington, for the appellant.

*W. E. Holmes, Mark H. Adams, Howard L. Baker, Charles E. Jones, Edward F. Arn,* all of Wichita, and *Logan Lane,* of Wellington, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This is an appeal from a judgment awarding damages for injuries sustained by plaintiff while passing between freight cars in the defendant's switchyard in Wellington.

Plaintiff was a grain sampler and inspector for the Hunter Milling Company, which had one or more large mills and elevators in that city. He was permitted by the railway company to come into its switchyard to take samples of grain from railway cars consigned to his employer. The switchyard is quite extensive. There are twelve parallel railway tracks which lie side by side and stretch east and west for a mile or two. These tracks are connected by a lead track which permits freight cars to be switched from one track to any other. The first of these tracks on the south side of the switchyard is the "passing track," the next is the "main-line track," and the others, which are numbered from 1 to 10, are used for the storing and switching of freight cars and for the making up and breaking up of freight trains. In early summer, when the harvest is good, several hundred cars of wheat arrive daily in Wellington. The switchyard is liable to become congested; and the problem of handling the carloads of wheat becomes so acute that three engines and nine switching crews are required to keep the traffic moving.

The cars of wheat consigned to the Hunter Milling Company were usually placed on tracks 2 and 3 immediately north of the main-line track.

On the morning of June 23, 1937, the plaintiff, Paul Jones, and two other men, Dort Clark and Kenneth Denny, who worked under his direction, were engaged in taking samples and inspecting grain in freight cars standing on tracks 2, 3 and 4. In the course of their work they carried sacks suitable to hold samples of grain, a small crowbar, canvas, some car seals and a trier rod. This instrument is a brass tube about 5 feet long and 2 inches in diameter. It is pushed down into a mass of wheat and will draw out a sample of grain. The inspectors usually got through their work about ten o'clock in the forenoon.

Plaintiff's testimony giving an account of his accident reads, in part, thus:

"My accident occurred about 10 o'clock on the morning of June 23. I went to work about 5:45 or 6 o'clock that morning. Kenneth Denny and Dort Clark were with me. . . . The grain rush season had been under

way about a week or ten days. I have been a grain inspector for a little less than ten years. . . . As a rule we work from the south side of the tracks . . . the grain doors on that side of the car are usually lower. Most of the country elevators load the cars from the south side; therefore, over 50 percent of the cars have a lower grain door on the south than on the north. Cars are usually loaded two-thirds to three-fourths full. We were working on track 4 immediately before my accident. We had taken samples on tracks 2, 3, and 4 before that. We had some more cars on track 2 to sample. . . . We were sampling cars on track 4. I believe we had seven cars there on track 4, and I opened the doors on all of them, and Dort Clark sampled three and Denny sampled three and that left one car. . . . I sampled the last car. . . . I then crossed track 3. I crossed track 3 by climbing up the ladder on the end of the box car and stepped on the coupler, and then down on the ground on the other side. . . . I then started to climb this ladder on the end of the car [on track 2] and was intending to step on the coupler and down on the ground on the south side. As I was climbing up this ladder and intending to step on this coupler, the switch engine hit a severe jolt on the east and jerked me loose and over to the next car west, and I fell down on the top of the rail and partly on the rail, and partly on the ground, with this car moving toward me, and I immediately started to scramble to get off the rail if possible. I managed to get off, all with the exception of my right leg, and this northwest wheel caught my leg and for some reason didn't run over it but started skidding it along the rail. The wheels skidded my leg on the rail. It started dragging me by this leg. I was screaming for help all the time and kept trying to hold my body away so this other wheel coming behind the front wheel would not catch me and it drug the skin and flesh off my hip and shoulder and finally the car stopped, and finally someone appeared on the scene and discovered me under there."

Plaintiff's petition stated his cause of action at length. One of its allegations was that track two was a "hold track," which defendant devoted to the placing of grain cars which were to be inspected, and that cars on that track were not to be moved until such inspection was completed. The petition charged defendant with negligence in many particulars—bumping cars on the "hold track" with a switch engine when defendant's servants knew that grain samplers and inspectors were or might be at work thereabouts; bumping or moving cars placed on a "hold track" for inspection purposes; moving cars on a "hold track" after being warned that plaintiff was working in or about them; failing to sound a whistle or give some signal or warning before moving the cars; running the switch engine with such force and violence as to throw plaintiff under the car wheels; disregarding the defendant's own rules touching the handling of freight cars on "hold tracks."

Defendant's answer pleaded a general denial, contributory negligence, and that plaintiff's accident and injury were the result of the ordinary risks of his employment, and that they were not the result of any negligence on the part of defendant or its employees.

The cause was tried before a jury. Defendant's demurrer to plaintiff's evidence was overruled. Defendant then adduced its evidence. Some rebuttal testimony was offered. The jury returned a general verdict for plaintiff, and answered special questions thus:

"1. At what rate of speed in miles per hour was the switch engine moving when it coupled into and pushed the string of cars on which and at the time plaintiff was injured? A. 2½ m. p. h.

"2. If you find for the plaintiff, in what respect was the defendant negligent? A. Improper warning, if any.

"3. Could the plaintiff have taken a safe way by walking around the string of cars on track No. 2 and thereby have avoided being injured? A. Yes, if ordinary care is exercised.

"4. Was the plaintiff, at the time and place he was injured, attempting to cross track No. 2 by crawling under a car or a coupler? A. No.

"5. Did Engine Foreman Quillen, just a short time before the plaintiff was injured, state in substance to the plaintiff, that 'we' (meaning the engine crew) 'are going to switch some cars in on track No. 2'? A. We believe Quillen made the statement, but we also believe that plaintiff did not hear it. We further believe that Quillen did not make the statement for the purpose of warning plaintiff.

"6. If you find that the plaintiff was attempting to pass between the cars by going over the coupler, was his attempt to pass over the coupler substantially interfered with by having the trier rod in his left hand and the sack of wheat in his right hand? A. Plaintiff's movements not substantially interfered with.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"8. Were plaintiff's injuries the result of an inevitable accident as defined to you in instruction No. XVII? A. No.

"9. Was the engine, or any of the cars, or any equipment thereof, damaged in any manner by the coupling at the time plaintiff was injured? A. No.

.   .   .   .   .   .   .   .   .   .   .   .

"11. Could the plaintiff have safely performed his duties in taking the samples of wheat from the cars in the west yard of the defendant by working down the same side of all cars on the same track, passing around the end of the string for the purpose of working in the same manner on the cars on the next track? A. Yes, if ordinary care is used."

Defendant filed a motion for judgment *non obstante*, on the ground of inconsistency between the general verdict and the special findings, and on account of "the findings, the evidence and the law."

This motion was overruled and judgment on the general verdict was entered for plaintiff.

Error is based on the trial court's ruling on the demurrer to the evidence, and on the motion for judgment on the jury's special findings.

Touching the first of these, there was some evidence which, although sharply controverted, did tend to show that tracks 2 and 3 in defendant's switchyard were designated as "hold tracks" upon which grain cars were placed for sampling and inspection, so that plaintiff could safely work in and about them without risk of their being moved until the inspection work was done.

Plaintiff's evidence likewise tended to show that defendant's switching crew knew that plaintiff had not completed his inspection work on the morning of the accident at the time the cars on hold track No. 2 were bumped by the switch engine.

Plaintiff's evidence also tended to show that if and when it was necessary to move or bump cars on tracks 2 and 3 while inspectors were working, the custom was for some member of the switching crew to warn the inspectors.

While defendant's evidence was to the effect that while tracks 2 and 3 were designated as "hold tracks," the purpose of such designation was merely for the convenience of plaintiff's employer, the Hunter Milling Company, so that carloads of wheat consigned to it could be more readily found in the switchyard where in busy seasons some 700 to 800 cars were received daily; and that the defendant had no rule or custom that cars so placed were not to be moved during inspection hours—that evidence must be entirely disregarded in determining the propriety of the trial court's ruling on the demurrer to plaintiff's evidence. (*Meneley v. Montgomery*, 145 Kan. 109, 64 P. 2d 550.)

Counsel for defendant direct our attention to instructive cases where damages were denied to licensees who suffered injuries in a railway switchyard while climbing between freight cars, or going between the couplers of cars with little space between them. (*St. Louis-S. F. Ry. Co. v. McClinton*, 178 Ark. 73, 9 S. W. (2d) 1060; *Lambrakis v. Chicago, R. I. & P. R. Co.*, 198 Ia. 641, 199 N. W. 994.)

Counsel for plaintiff rely strongly on our own case of *Degitz v. Railway Co.*, 97 Kan. 654, 156 Pac. 743. In that case the defendant railway had placed a freight car on a transfer track from which,

after inspection, it could readily be shunted to the Union Pacific railway tracks, to which it was to be transferred for delivery at its final destination. While inspecting the car to determine whether it was in acceptable condition two Union Pacific railway inspectors were killed. This court held that in their character as inspectors they were invitees, which entitled them to the care due to those rightfully in and about the car intended to be delivered to their employer. It may be true, however, that the grain inspectors for the milling industry in Wellington could hardly be classed as invitees, so as to put them on the same footing as inspectors employed by one of the railways itself. (2 Words and Phrases, 2d ed., 1190-1193.) But whether plaintiff was an invitee, or merely a licensee, he was entitled to rely on the defendant's rule (if there was such a rule) that grain cars on tracks 2 and 3 would not be moved during inspection hours. Counsel for appellee direct our attention to certain negligence cases which arose out of personal injuries sustained in and about switchyards and loading piers, and where it was held that the circumstances required the issues of negligence to be submitted to a jury. Those we have examined and found to be somewhat helpful are: *Chicago, St. P., M. & O. Ry. Co. v. Nelson*, 226 Fed. 708, 712; *Neal v. Curtis Co. Mfg. Co.*, 328 Mo. 389, 41 S. W. (2d) 543; *Copley v. Union Pac. R. R. Co.*, 26 Utah 361, 73 Pac. 517; *Texas & Pacific Ry. Co. v. Behymer*, 189 U. S. 468, 47 L. Ed. 905; *Balto. & Ohio R. Co. v. Charvat*, 94 Md. 569, 51 Alt. 413; *Johnson v. Brick & Coal Co.*, 276 Mo. 42, 205 S. W. 615; *Payne, Agent, v. Raymond's Admr.*, 198 Ky. 74, 248 S.W. 224.

Defendant argues that there was no practicable means whereby it could have notified plaintiff of the movement of cars on track No. 2. Of course, if there was a hard-and-fast rule that cars so placed should not be moved at all until the work of grain sampling and inspection was completed, the suggested point would be immaterial. But there was evidence that it not only was practicable to warn the grain inspectors, but that when cars were to be moved on "hold tracks" such a warning was given. Witness Summers, state grain inspector, testified:

"A hold track is where they set this grain to be inspected. . . . It is a hold track for the protection of the state men. The cars are not supposed to be moved prior to the time samples are taken from the grain cars on the designated hold tracks unless the switching crew comes down and tells us they are going to bump into the cars. The cars I am referring to are those on designated hold tracks."

Witness Hyndman also testified:

"After Paul's injury on the 23d, while I was working on cars getting samples on tracks 2 and 3 in the west yards, I experienced a switch engine bumping into and moving those cars. Before they moved those cars, they would call or signal that they were coming in. The cars on tracks 2 and 3 after June 23 were never moved while I was working on them without me being notified. . . .

"Some member of the switching crew would give warning before bumping cars on tracks 2 and 3 while we were working there."

We think that given the generous credence to which evidence is entitled when the trial court is called upon to measure its probative value as against a demurrer, it cannot be said that plaintiff completely failed to make a prima facie case for the jury, and the court's ruling on defendant's demurrer was correct.

Coming now to the question whether the general verdict is consistent with the special findings of the jury, and the related question whether certain of those special findings did not require judgment thereon to be entered for defendant, it will be noted that of all the allegations of negligence charged in plaintiff's petition, the only negligence found by the jury was that defendant gave an "improper warning, if any." (Finding No. 2.)

It is, of course, elementary that when a defendant is charged with various acts of negligence and the jury specially finds him guilty of one of the acts so charged, he is thereby exonerated as to the others. (*Brim v. Atchison, T. & S. F. Rly. Co.*, 136 Kan. 159, 162, 12 P. 2d 715; *Cole v. Cook*, 137 Kan. 250, 253, 20 P. 2d 483; *Lee v. Kansas City Public Service Co.*, 137 Kan. 759, 766, 22 P. 2d 942.)

So much of plaintiff's cause of action as was based on the allegations of his petition that the cars on "hold tracks" were not to be moved during inspection hours necessarily failed with the failure of the other charges of negligence on which the jury exonerated the defendant. In other words, cars on "hold tracks" could be moved during inspection hours if a proper warning were given. The fault of defendant, according to the jury's finding, was in giving an "improper warning, if any."

Defendant complains of the qualification the jury placed on its affirmative answer to special question No. 5. It contends that there was no evidence adduced to show that plaintiff did not hear Foreman Quillen's warning. That point is untenable for the reason that defendant accepted the special findings as returned by the jury and invoked final judgment thereon. No motion for a new trial was

filed nor one attacking the special findings for want of support in the evidence. Therefore, finding No. 5 must stand. (*Commercial Trust Co. v. Pioneer Cattle Loan Co.*, 120 Kan. 712, 716, 244 Pac. 840.)

We now come to what may be regarded as the most critical phase of this appeal—the proper significance which the trial court should have given, and which this court must give, to the jury's special findings No. 3 and No. 11.

The jury specifically found that with the exercise of ordinary care plaintiff could have taken a safe way by walking around the end of the cars on track 2 and thus have avoided being injured. As we have just stated above, since neither party attacked the special findings and no motion for a new trial was filed by either litigant, we will have to accept both these findings as established by the evidence. To fully realize the significance of finding No. 11, we repeat it here:

"11. Could the plaintiff have safely performed his duties in taking the samples of wheat from the cars in the west yard of the defendant by working down the same side of all cars on the same track, passing around the end of the string for the purpose of working in the same manner on the cars in the next track? A. Yes, if ordinary care is used."

Defendant specifically pleaded plaintiff's contributory negligence. Does not this special finding support that defense? We have stated above that whether plaintiff was an invitee or mere licensee he had a right to assume that the company's employees would conform to its rules concerning the handling of cars in its switchyard. But neither a license to plaintiff to inspect cars on its tracks 2 and 3, nor an invitation to do so, could fairly be said to imply a license or invitation to climb over the couplers in going from one string of wheat cars on track 2 to another on track 3, or vice versa. Moreover, according to plaintiff's own testimony, when he went over to track 4 to inspect a car there he did go around the end of the string of cars on track 3. His testimony reads:

"I was working on track 3 and I just happened to see some of our grain cars over on track 4, which was the first track north of track 3.

"Q. And next to which track did you get out of the car? A. I was along on that lead track, along about between tracks 4 and 2, along in there some place; possibly opposite 3.

"Q. You got out at the south door, did you? A. Yes, sir.

"Q. How did you get around that cut of cars and engine there, or where did you go when you got out? A. I went from there to track 4."

Testifying to his route returning from track 4, he said:

"I could have gone down the track and around the end of the string of cars.
"Q. I asked you if you would have come out around the string of cars and come out on track 1? A. If I had come on track 2 and crossed over behind the last car I would have come out on track 1, providing the switch engine had not bumped—"

Finding No. 11 is candidly responsive to the evidence, which was to the effect that it was entirely practicable to keep on one side (the south side) of a string of wheat cars on a "hold track" and inspect them one after another until that string was finished; then to go around the end of that string in safety—"yes, if ordinary care is used,"—and commence on the cars on the next "hold track." If plaintiff had been injured by a bump of the switch engine while he was actually engaged in his work of inspection, and that bump had occurred because of no warning, or "improper warning, if any," there would have been good solid ground for a verdict in his behalf. It can hardly be inferred that plaintiff's employer, the Hunter Milling Company, expected him to perform his inspection duties by the dangerous method of climbing over the couplers of cars in a congested switchyard. But if it did, it would indeed be a hard rule of law that would say that it is the railway company and not his own employer which should pay for his injuries. The evidence tended to show without dispute that the railway company expressly forbade its own employees to indulge in such a dangerous practice as that of climbing over the couplers in a congested switchyard. We think neither defendant nor its switching crew should be charged with notice that grain inspectors—employees of another master—on its premises as licensees, or even as invitees, were indulging in such needless hazards, so as to charge the railway company with a duty to look out for them whenever it intended to move its cars. Moreover, there was no evidence that defendant or its employees were aware that either plaintiff or other grain inspectors generally practiced the dangerous habit of climbing over the couplers in the Wellington switchyard in the season of traffic congestion.

It is an elementary rule of law that every person must exercise ordinary and reasonable care for his own safety and not expose himself to unnecessary risks, dangers or hazards in the pursuit of his calling. It is also the law that where a person is confronted with the necessity of choosing between a dangerous course and one safe or less dangerous it is his duty to choose the latter. These simple rules

of law were pertinent in this case and the jury were so instructed. One pertinent instruction which the trial court gave, in part, reads:

"16. A person to whom two courses of conduct are open is required to exercise ordinary care in choosing which course he will pursue. If, under the same or similar circumstances, an ordinarily prudent person would not have so chosen, one having a choice is negligent in pursuing a course which is dangerous rather than one which is safe or even less dangerous. This is true, even though the course pursued is easier or more convenient, and even though the risk of injury involved is not so great but that an ordinarily prudent person would have incurred it had the safer course been unavailable. However, ordinary care in making a choice between courses of conduct is all that is required. While the existence of a safe or safer course is. to be considered in determining whether ordinary care was exercised, ordinary care does not require that every act be done in the safest way, and regard is to be had to all the other surrounding circumstances."

That instruction became the law of this case, so far as the plaintiff was concerned, since he made no complaint of it. (*U. P. Rly. Co. v. Hutchinson,* 40 Kan. 51, 53, 19 Pac. 312; *Railway Co. v. Schroll,* 76 Kan. 572, 92 Pac. 596; *Colwell v. Parker,* 81 Kan. 295, 105 Pac. 524; *Johnson v. Oil & Gas Co.,* 114 Kan. 519, 220 Pac. 176; *Winston v. McKnab,* 134 Kan. 75, 4 P. 2d 401.) It necessarily follows that special findings of the jury Nos. 3 and 11 must control this appeal. Read in the light of their text and the evidence upon which they were based, and the trial court's instructions pertaining thereto, the general verdict must be held inconsistent therewith, and defendant was entitled to judgment thereon. (*Kansas State Bank v. Skinner,* 121 Kan. 322, 246 Pac. 497; *Musgrave v. Equitable Life Assurance Society,* 124 Kan. 804, 262 Pac. 571; *Clark v. Missouri Pac. Rld. Co.,* 134 Kan. 769, 8 P. 2d 359; *Dye v. Rule,* 138 Kan. 808, 811, 28 P. 2d 758; *Hiler v. Cameron,* 144 Kan. 296, 59 P. 2d 30.)

The judgment of the district court is therefore reversed and the cause remanded with instructions to enter judgment for defendant on the jury's special findings of fact Nos. 3 and 11.

WEDELL, J., dissents.

SMITH, J. (dissenting): I dissent. The prevailing opinion attaches a greater significance to the answers to questions 3 and 11 than the issues and the facts warrant. The question was not whether the plaintiff could have done his work safely in some other manner than that in which he did do it, but whether the plaintiff under all the facts and circumstances used due care in the manner in which

he did do it. The jury found the negligence of the defendant to be "improper warning, if any." Warning of what? Undoubtedly the warning referred to was warning that it was about to bump the string of cars on which plaintiff was working. Plaintiff would not have climbed up on the coupler had he been warned that the defendant was about to bump this string of cars. The prevailing opinion states, "But whether plaintiff was an invitee or merely a licensee he was entitled to rely on the defendant's rule (if there was such a rule) that grain cars on tracks 2 and 3 would not be moved during inspection hours." Of course, notwithstanding this rule, plaintiff would not have crawled up on the coupler had he been warned that the string of cars on which he was working was about to be bumped. In the absence of a warning, however, he certainly had a right to expect that the cars would not be bumped. If this string of cars had not been bumped then the way he saw fit to do his work was just as safe as the plan of walking clear around the string of cars; safer, in fact, because the latter method would keep him around the yards longer and the risk involved was no greater than that involved in climbing in and out of the grain cars. The very nature of the work required inspectors to do this. There is hardly a case involving personal injuries where the plaintiff could not have avoided the injury had he taken a different course. That is not the controlling rule, however. The question is, Was his conduct the conduct of an ordinary, reasonable man under the surrounding facts and circumstances? In my opinion, the conduct of plaintiff meets the above requirement and the judgment should be affirmed.

HARVEY, J., joins in this dissent.