### No. 34,489

WASKEY ELWOOD WALLS, an Infant, by MAY WALLS, His Next Friend, *Appellee*, v. THE CONSOLIDATED GAS UTILITIES CORPORATION et al., *Appellants*.

(96 P. 2d 656)

920

Opinion filed December 9, 1939.

*Arnold C. Todd* and *Kurt Riesen,* both of Wichita, for the appellants.

*James B. Nash* and *Robert R. Hasty,* both of Wichita, for the appellee.

The opinion of the court was delivered by

Hoch, J.: This was an action for damages for injuries sustained by an eight-year-old boy when he was hit by a truck. Plaintiff prevailed and the defendants appeal.

The accident took place on the afternoon of January 23, 1937, on Second street between St. Francis and Emporia avenues, in Wichita. A snow had fallen a day or two before and had been scraped into the center of the street, making a ridge several feet wide at the base and one or two feet high. The street was icy, slippery or slushy. Second street is forty feet wide, and cars were parked parallel to the curb on the south side and diagonally on the north side. The day was clear. Defendants' truck, belonging to the Consolidated Gas Utilities Corporation, was being driven by Tucker, an employee of the company. The truck was going west on Second street and had stopped at a traffic light at the intersection of Second and St. Francis and was the first car to proceed westward at the "go" signal. There was nothing to obscure the vision of the driver as he proceeded westward other than such cars as were parked along the street. When he had reached a point forty or fifty feet west of the north-and-south alley which crosses Second between St. Francis and Emporia avenues, Waskey Walls, who was then eight years old, was hurrying across the street northward and was struck by the truck. What part of the truck hit him is not entirely clear from the record. The boy testified that he was hit by the front bumper. The principal injury alleged was a severe fracture of the femur bone of the right leg, together with shock to his entire system. Tucker, the truck driver, had applied his brakes in order to avoid hitting the boy and swung his truck to the left and into the snow ridge. When the truck came to a stop it was heading somewhat to the southwest. The boy was lying a few feet to the west or northwest of the right rear end of the truck.

The acts of carelessness and negligence alleged in the petition were in substance: driving the truck at a greater rate of speed than twenty-five miles per hour, to wit, at the rate of approximately thirty miles per hour, in violation of the city ordinances; driving at a greater rate of speed than was reasonable, safe and proper, having due regard for the use and condition of the street and the occupancy thereof, and at a rate of speed such as to endanger the life, limb and property of others on the street in violation of the city ordinance; failing to keep a proper lookout for persons crossing the street; failing to have the truck equipped with chains; failing to observe the plaintiff as he was crossing the street; and failing to bring the truck to a stop before striking the plaintiff. The answer denied all carelessness and negligence on the part of the defendants and alleged negligence on the part of the plaintiff.

An action involving the same accident was first tried in 1937 and verdict rendered for the plaintiff for $1,500. On appeal the verdict was set aside and a new trial granted on the principal grounds that the answers of the jury to some of the special questions submitted were inconsistent with each other and with the general verdict. (148 Kan. 896, 84 P. 2d 881.) The instant action was tried in April, 1939. At the close of plaintiff's testimony the defendants demurred to the evidence. The demurrer being overruled, defendants introduced their evidence. The jury returned a verdict for the plaintiff for $2,500, and answered certain questions submitted. Defendants moved to set aside certain of the jury's answers, for judgment notwithstanding the general verdict, and for a new trial, all of which motions were overruled.

Sixteen special questions were submitted and answered. Again, as in the former review, the appeal is concerned principally with the special questions and answers. The specifications of error also include the overruling of the demurrer, the giving of certain instructions, and the overruling of the motions heretofore referred to.

The plaintiff is entitled to have the evidence construed in the way most favorable to him and to have the verdict upheld if possible. With that principle in mind, we have carefully examined the evidence in its relation to the answers to the special questions, and particularly the evidence on the part of witnesses for the plaintiff.

"Q. 2. Did plaintiff immediately prior to the accident understand and appreciate that he was likely to be injured in crossing the street unless he was careful in avoiding moving vehicles? A. Yes, but he failed to realize the danger."

It is hard to understand just how the plaintiff could "appreciate that he was likely to be injured in crossing the street unless· he was careful in avoiding moving vehicles" and at the same time "failed to realize the· danger." However, the jury may have had some distinction in its mind, and we shall not stress the apparent inconsistency in the answer.

"Q. 3. Did plaintiff take the ordinary precautions for his own safety that a reasonable, normal child of his age, understanding and intelligence would have taken under the circumstances? A. Yes."

Appellants say there was no testimony whatever to support this answer. The only evidence we have been able to find is the testimony of witness Mason, who said:

"When I first saw him [Waskey Walls] he was seemingly waiting for the truck going east to get by. I don't know where he was standing when I first saw him. The United Sash & Door truck was going east. The boy went in front of it,· barely escaping being hit. He paused momentarily on the snow ridge in the center of the street, then darted across the street. He was looking at the truck coming toward him."

Perhaps Mason's statement that the boy was "seemingly waiting for the truck going east to get by," and that "He was looking at the truck coming toward him" was some evidence of precaution.

"Q. 4. Do you find that plaintiff (a) Ran into Second street? A. No. (b) Entered Second street from behind parked car. A. No."

We do not know on what testimony the jury said the boy did not run into the street. Three witnesses for the plaintiff testified they saw the accident. They were Whitely, Medcalf and Mason. In addition to testimony of Tucker, the truck driver, the defendants submitted a transcript of the testimony of witness Neas who was a witness for the plaintiff at the first trial, but who was outside the state at the time of the second trial. Whitely was sitting in his car, which was facing east and was parked on Second at the southwest corner of Second and Emporia. He testified:

"I could see the accident reasonably well. As nearly as I can remember, I saw the boy come *hurriedly* to the pile of snow; climb up onto the pile of snow and down on the other side into the path of an approaching truck. The lad was traveling in a northeasterly direction. I did not see him as he first entered the street, because there were other cars parked along the street so that he did not come into my path of vision until he had come toward the center of the street. There was another truck going east at the time. It was owned by the United Sash and Door Company. I couldn't say as to whether the boy stepped in front of the truck going east, on behind it, but I know that he had a narrow escape. I don't know at what point the little fellow entered the

street. I don't know whether he came down a driveway of the D. A. Winters filling station or from some other place. *All I know is that he was on his way hurriedly across the street.* There were cars parked on the south side of Second street, I don't recall how many, or exactly where they were, but I know there were some cars parked there.

. . . . . . . . . . . . . . . .

"When, I first saw the boy, he was just approaching the pile of snow in the center of the street. He seemed to lose his balance as he came up onto the ridge. It was just a little too much for him to negotiate in regular walking so he attempted to climb over it and he did climb over and *hurried across the street* directly into the path of this (defendant's) truck."

On cross-examination Whitely said:

"There was a truck proceeding down the south side of Second street going east. Suddenly, I saw a boy as I looked to the east. He was on the north side of the truck going east, approaching the snow ridge in the middle of the street. *The little fellow was running."*

Witness Medcalf, for the plaintiff, was sitting in the car with Whitely. He testified:

"I just happened to look down there just as the boy was at the bank of ice, just ready to cross. He paused momentarily and crossed over the ridge. Mr. Tucker's truck was approaching right there at the same time. I saw the truck hit the boy as it turned. I don't know where the boy came from. I did not see him as he entered Second street. There was a truck going east at the time, I don't know whether the boy passed in front of the eastbound truck or back of it."

On cross-examination he said:

"The boy was right at the snow ridge ready to go over the ice when I first saw him. *He was moving rapidly, getting ready to spring over the ridge.* . . . I did not see the boy at the time he left the south curb. When I saw him he was just about ready to jump over the snow ridge heading right into the path of the westbound truck. The truck was already pretty close to him."

Mason, an employee at a filling station at the southeast corner of Second and Emporia, and a witness for the plaintiff, testified that he had just come out of a door at the station and was going across the street. He testified:

"When I first saw him, he was seemingly waiting for the truck going east to get by. I don't know where he was standing when I first saw him. The United Sash and Door truck was going east. The boy went in front of it, barely escaping being hit. He paused momentarily on the snow ridge in the center of the street, *then darted across the street."*

⌐ Witness Neas, who was the driver of the eastbound truck which barely missed hitting the boy, testified:

"I saw Waskey Walls as he came north across the street. He *ran in front*

*of my truck* and went on across the street in front of the westbound truck. I did not see the boy until he was out in the street."

It thus appears that all witnesses testified that the boy was either "hurrying" or "running" or "moving rapidly" or "darting across the street." The only way that testimony could possibly be harmonized with the jury's answer would be to say that at the one instant the boy entered Second street he was not running. There was no testimony at all on that point.

"Q. 5. Where and at what point on Second street did plaintiff enter Second street? A. From east drive of D. A. Winters."

Perhaps it cannot be said that there was no evidence whatever to support this answer, but it was certainly extremely meager. Whitely, who was sitting in his car looking eastward, testified, "I did not see him as he first entered the street, because there were other cars parked along the street so that he did not come into my path of vision until he had come toward the center of the street. . . . I don't know at what point the little fellow entered the street. I don't know whether he came down a driveway of the D. A. Winters filling station or from some other place." Witness Medcalf said he did not know where the boy came from. Witness Neas said: "I did not see the boy until he was out in the street. The reason for that being that the boy came out between a couple of cars parked along the south side of Second street." Witness Mason, who had seen the boy before he started into the street, testified: "I don't remember whether the boy was in the driveway north of the building or on the sidewalk. He entered the street either here or in here (pointing). He might have come out of a driveway, but I am at a loss to say he did or not. Perhaps he probably did." Undoubtedly there were cars parked on the south side of the street, although the evidence does not disclose how many. Mason's statement that the boy was probably standing in the driveway, though he didn't know or remember where he was standing, is the only testimony we can find which could possibly support the answer that the boy did not come out from behind parked cars, or that he entered the street from Winters' east driveway.

"Q. 8. Approximately where was the plaintiff when Tucker first saw him? A. Passing in front of eastbound truck.

"Q. 9. What precaution, if any, did Tucker take to avoid striking the plaintiff after he first saw him? A. None.

"Q. 10. What precaution, if any, did Tucker take to avoid striking the plaintiff the moment before striking him? A. Applied his brakes and turned south into snowbank in middle of street.

"Q. 11. Approximately where was Tucker when he first saw the plaintiff? A. East side of alley."

It will be noted that by answers 8 and 11 the jury said that the boy was "passing in front of the eastbound truck" and Tucker was "east side of the alley" when he first saw the boy. We find no testimony whatever to support the answer to question No. 11. The only person who testified as to where Tucker was when he first saw plaintiff was Tucker himself. He said:

"As I got just west of the alley there was a truck coming east on the south side of the street. Just before I passed the eastbound truck, just in a flash, there was a boy in the center of the street. I don't know where he came from, but he was directly in front of the other truck."

It is true that witnesses testified that the view down the street was unobstructed, but this does not justify a finding that Tucker actually saw the boy when he (Tucker) was east of the alley. In fact, all the other testimony discredits such an answer, even as a conclusion. It was evidently only a moment or two from the time the boy entered the street until he was struck by the truck. Whitely testified that "it all happened in a split second of time," and yet the jury's answer would have the defendants' truck travel from a point east of the alley—at least sixty to seventy feet—apply the brakes, and hit the boy while in the same length of time the boy only covered the few feet from a point in the eastbound lane to a point beyond the center of the street.

*Questions 14 to 16:*

"Q. 14. Was the defendant Tucker guilty of any act or acts of negligence that proximately caused the accident? A. Yes.

"Q. 15. If you answer the foregoing question in the affirmative and only in that event, state specifically the nature of such act or acts of negligence? A. Tucker was driving at a greater rate of speed than is reasonable, safe and proper having due regard for the use and condition of the street and the occupancy thereof at the time, and at such a rate of speed as to endanger the life, limb and property of any person according to instructions set forth in number 16 of court's instructions.

"Q. 16. How fast was defendant Tucker driving his truck when he first saw the plaintiff? A. Seventeen miles."

It thus appears that the only act of negligence imputed to Tucker by the jury was that he was driving at a greater rate of speed than was safe and proper having regard for the use, condition and occupancy of the street at the time, and at a rate which endangered people on the street. This answer merely states a conclusion. What evidence supports it? What was the testimony on the question of

speed? The jury found the truck was traveling at seventeen miles an hour. This answer was apparently based upon Tucker's testimony, who said he was going from "fifteen to twenty miles, maybe seventeen." Neas testified that the truck was probably traveling between fifteen and twenty miles an hour. Whitely testified, "From the time I first saw the truck as it approached the point of impact, *it was being driven at a moderate rate of speed*." Medcalf testified, "*The westbound truck was being* driven at a moderate rate of speed." It appears, therefore, that all we have as to speed is the jury's finding that the truck was going seventeen miles and the testimony of plaintiff's witnesses that it was traveling at "a moderate rate of speed." Considered by itself, the answer "seventeen miles" certainly could not be held to establish unreasonable speed, as a matter of law. And as heretofore stated, the answer to question 15, being a conclusion, can only stand, if supported by evidence. There was no testimony whatever that "seventeen miles" or "a moderate rate of speed" was too fast under the conditions then and there existing. No testimony was offered as to what rate of speed would have been safe and proper under the circumstances. In fact, in the absence of any statement or showing to the contrary, "a moderate rate of speed" can only be interpreted as a rate that was moderate under the conditions and circumstances then and there existing.

The jury did not find that the defendants failed to keep a proper lookout or that they were guilty of any of the other acts of negligence alleged in the petition. When the jury found that the specific negligence chargeable to the defendants was that Tucker was driving at an unreasonable speed, it thereby absolved defendants from the other allegations of negligence. (*Roberts v. Railway Co.*, 98 Kan. 705, 161 Pac. 590; *Bass v. St. Louis-S. F. Rly. Co.*, 143 Kan. 740, 744, 57 P. 2d 467; *Cole v. Cook*, 137 Kan. 250, 20 P. 2d 483; *Stock v. Scott*, 132 Kan. 300, 295 Pac. 638; *Brim v. Atchison, T. & S. F. Rly. Co.*, 136 Kan. 159, 12 P. 2d 715; *Adams v. Railway Co.*, 93 Kan. 475, 144 Pac. 999.)

If the truck was ten feet from the plaintiff when the brakes were first applied and five feet or less from him when the truck turned into the ridge of snow, certainly no lack of good brakes was indicated.

In answer to special questions the jury said that Waskey was an intelligent and normal child, and that he was not guilty of any act of negligence or carelessness that proximately contributed to his in-

jury. He should not, of course, be held to the degree of accountability of an older person, but only to that of an ordinary normal child of his age. However, in view of the conclusions reached on other questions, we do not deem it necessary to discuss the question of contributory negligence. Nor is it necessary to discuss other assignments of error.

It is clear that defendants' motion to strike should have been sustained as to answer to question No. 11, as to answer to question No. 15, together with the answers to the preliminary questions Nos. 13 and 14. Having been so sustained, the defendants would stand charged with no negligence and would have been entitled to an order sustaining the motion for judgment notwithstanding the general verdict.

The verdict must be set aside with directions to enter judgment for the defendants. It is so ordered.