No. 47,226

DARRELL A. MARTIN, Conservator for KERRY N. MARTIN, a Minor, *Appellee*, v. STATE HIGHWAY COMMISSION OF KANSAS, *Appellant.*

(518 P. 2d 437)

Opinion filed January 26, 1974.

*Charles S. Schnider,* of Schnider, Shamberg and May, of Kansas City, argued the cause, and *Paul W. Clark,* staff attorney of the state highway commission, was with him on the brief for the appellant.

*Charles S. Fisher, Jr.,* of Fisher and Benfer, Chartered, of Topeka, argued the cause, and *Jerry R. Palmer* and *Robert D. Ochs,* of the same firm, were with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This is an appeal by the state highway commission from a judgment against it for personal injuries attributed to an alleged highway defect.

In the early morning hours of January 5, 1969, nineteen-year-old Kerry N. Martin was a passenger in a car owned and driven by his friend, Luke Franzen. The boys had been on a double date, spending the evening at Luke's sister's house in Topeka listening to music, drinking beer and eating pizza. Some time after midnight they took their dates home, dropping one girl off in Cullen Village, at the south edge of Topeka, and the other at her home in rural southwestern Shawnee county. Their route home took them to state highway K-4, which runs north until it joins interstate 70 a few miles west of Topeka.

The intersection is of the type commonly employed where a secondary road gives access to an interstate highway. K-4 is twenty-four feet wide where it approaches and passes under the four lanes of I-70. Coming from the south, those proceeding east, toward Topeka, make a right turn onto an access road some 200 feet south of the interstate and go up a ramp into the eastbound lanes. Those going west, toward Junction City, proceed under the interstate, make a left turn, and go up a ramp into the westbound lanes. The

interstate overpass is supported by concrete pillars, either 9 feet, 3 inches or 9 feet, 4¾ inches from the edge of the K-4 pavement, depending on whose tape measure was more accurate.

Just south of the overpass is a sign, mounted on two steel supports, marked "Junction City," with an arrow indicating a course straight ahead, then sharp left. Several hundred feet to the south of the intersection, at the crest of a slight hill, there was the customary large information sign indicating the presence of the intersection, diagramming the overpass, and showing the alternative routes.

At about 2:00 a. m. the car containing the two boys approached the intersection from the south, passed the access road leading to the eastbound lanes, went off the right (east) side of the road, sheared off the "Junction City" sign, and literally wrapped itself around the first pier supporting the interstate overpass. The car left skid marks measured by one witness the next day at 448 feet, and esimated by others at as much as 100 feet more or less. Plaintiff's expert put the car's speed at 56 miles per hour at the time it hit the pillar; the commission's experts had different opinions, but the differences are not significant. The car was obviously going considerably faster before it began its skid. The skid marks indicated to everyone's satisfaction that as it skidded the car began rotating to the right, so that at the time it hit the pillar the front end angled 30 degrees to the right of the center line of the roadway. Thus, it was the left side of the car which struck the pillar.

Luke Franzen, the driver, was killed—probably instantly. Kerry received severe injuries, including brain stem damage which prevents him from walking without mechanical and human assistance, and from communicating orally. This action was brought on his behalf by his father as his conservator. The severity of his injuries may be judged from the fact that in its appeal the commission makes no claim that the $600,000 verdict was excessive or not supported by the evidence.

What the commission does contend, first and foremost, is that as a matter of law there was no highway defect, and the issue should not have been submitted to the jury. The contention was made below by motion for directed verdict and motion for judgment notwithstanding the verdict, and is urged most vigorously on appeal. A majority of the court is of the opinion that the contention is sound.

At the outset it should be noted that at trial some eight different conditions, including improper and inadequate markings, or warn-

ings, were urged by the plaintiff as making the highway defective. However, in answer to a special question as to the "defect or defects" which caused the accident, the jury's answer was "Absence of guardrail." By that answer the commission was acquitted of all other charges of defect. Cf. *Elliott v. Chicago, Rock Island & Pac. Rld. Co.*, 203 Kan. 273, 454 P. 2d 124; *Stevens v. Allis-Chalmers Mfg. Co.*, 151 Kan. 638, 100 P. 2d 723; *Walls v. Consolidated Gas Utilities Corp.*, 150 Kan. 919, 96 P. 2d 656; *Jones v. A., T. & S. F. Rly. Co.*, 148 Kan. 686, 85 P. 2d 15; *Rasing v. Healzer*, 157 Kan. 516, 142 P. 2d 832. The sole question in this court, then, is whether the absence of a guardrail protecting this particular pillar constituted a "defect" in the highway.

In such a case the rule has always been that, "While the question of what condition in a highway constitutes a defect may in some cases be one for the jury, this court can say whether a particular condition is such as was intended by the legislature to render the highway commission liable." (*Phillips v. State Highway Comm.*, 146 Kan. 112, 115, 68 P. 2d 1087.) Put another way:

"The state's liability for a defect in a state highway is purely statutory, and the state has no liability under the statute (K. S. A. 68-419) unless the alleged defect in the state highway comes within the purview of its terms, and such determination is in the first instance a question of law for the court. The court has steadfastly adhered to the proposition that there is no legal foot-rule by which to measure conditions generally and determine with exact precision whether a condition in a state highway constitutes a defect. In the final analysis it is the policy of the Supreme Court to handle each case separately and to either include it in or exclude it from the operation of the statute. (*Brown v. State Highway Commission*, 202 Kan. 1, 444 P. 2d 882, Syl. ¶ 2.)

This case-by-case approach has been necessary because the statute makes no attempt to define the conditions which will create liability beyond speaking of a "defective bridge or culvert on, or defect in a state highway." See the discussion of this problem in *Gorges v. State Highway Comm.*, 135 Kan. 371, 373, 10 P. 2d 834. The same may be said of K. S. A. 68-301, imposing similar liability on counties and townships, and the court has treated both statutes in the same way. While some apparent inconsistencies may result from such an approach, certain well defined patterns and consistent principles do emerge from the body of law represented by the cases in their entirety. (Most of the cases are collected in the annotations found in the statute book.)

First, claimed defects may be categorized according to when they arise. Probably most common are those which develop through

use, wear and tear, and efforts to maintain and repair a road, and are referred to as "maintenance" defects. These include the following examples: A ditch across a detour (not a *statutory* defect because not on the highway proper), *Cronin v. State Highway Commission,* 182 Kan. 42, 318 P. 2d 1066; a four inch drop-off from new paving to old on the main traveled portion of the road, *Earnest v. State Highway Commission,* 182 Kan. 357, 320 P. 2d 847; potholes and other depressions, *Bishop v. Board of County Commissioners,* 188 Kan. 603, 364 P. 2d 65, *Kelley v. Broce Construction Co., Inc.,* 205 Kan. 133, 468 P. 2d 160, *Backstrom v. Ogallah Township,* 149 Kan. 553, 88 P. 2d 1026, *Collins v. State Highway Comm.,* 138 Kan. 629, 27 P. 2d 216, *Williams v. State Highway Comm.,* 134 Kan. 810, 8 P. 2d 946; piles of dirt or gravel, *Schroder v. Kansas State Highway Commission,* 199 Kan. 175, 428 P. 2d 814, *Thompson v. Morris County Comm'rs,* 170 Kan. 74, 223 P. 2d 749, *Rockhold v. Board of County Commissioners,* 181 Kan. 1019, 317 P. 2d 490; crumbled edges of asphalt pavement (not a defect), *Summers v. State Highway Commission,* 178 Kan. 234, 284 P. 2d 632; smooth bridge planking which was slick when wet (not a defect), *Dunlap v. Lawless,* 192 Kan. 686, 391 P. 2d 70; rotten bridge railings, *Noblit v. Board of County Commissioners,* 190 Kan. 586, 376 P. 2d 872.

The second category comprises those defects which are built-in at the time a road is designed, referred to as "design" defects. These include: A road with inadequate drainage, *Hampton v. State Highway Commission,* 209 Kan. 565, 498 P. 2d 236; lack of stop signs, *Brown v. State Highway Commission,* supra, *Phillips v. State Highway Comm.,* 146 Kan. 112, 68 P. 2d 1087 and 148 Kan. 702, 84 P. 2d 927; lack of guardrails, *Snyder v. Pottawatomie County Comm'rs.,* 120 Kan. 659, 245 Pac. 162, *Dent v. Jefferson County Comm'rs.,* 118 Kan. 519, 235 Pac. 873, *Grier v. Marshall County Comm'rs.,* 128 Kan. 95, 276 Pac. 56, *Arnold v. Coffey County Comm'rs.,* 131 Kan. 343, 291 Pac. 762.

In this case there is no contention that the intersection here had deteriorated in any way. It remained just as it had been designed in 1957 and completed in 1961. Hence if the absence of a guardrail in this case was a defect in the highway, it was a defect in design, not in maintenance. (A third category, "construction" defects where an adequate design is improperly carried out by the road builder, need not concern us here. The original design for this intersection did not call for guardrails.)

But regardless of the source of the condition claimed to constitute a defect, liability for such a condition has always been predicated on either (1) the failure to comply with a specific legislative mandate, or (2) the existence of a condition creating actual peril to persons using the highway with due care.

This fundamental principle may be illustrated by reference to our stop sign cases. In *Coffman v. Fisher*, 203 Kan. 618, 455 P. 2d 490, a stop sign at the intersection of a township with a county road had been knocked down, and it was claimed that its absence constituted a defect. This court noted that the county road had not been designated a "through highway" by the board of county commissioners, and therefore there was no statutory duty to maintain a stop sign at the intersection. Absent such a statutory duty the lack of a stop sign was not a "defect," the court relying on the two *Phillips* cases, supra.

In contrast, *Brown v. State Highway Commission*, supra, held that under K. S. A. 8-510 the commission was under a legislative mandate to adopt a manual containing specifications for traffic-control devices. Once it was adopted, failure to comply with the manual and its specifications was the equivalent of a failure to comply with an express statutory duty. Hence a stop sign which did not meet the standards of the manual was a "defect" in the highway.

The guardrail cases offer further illumination. In *Grier v. Marshall County Comm'rs.*, supra, the plaintiff's steering gear broke and he went off a culvert which lacked a guardrail which was specifically required by the then applicable statute, R. S. 68-1110. Absence of the statutory guardrail was held to be a defect in the culvert, the court relying on *Dent v. Jefferson County Comm'rs.*, supra. The rule was developed in *Arnold v. Coffey County Comm'rs.*, supra, where the court said, "the omission of the responsible county officials to provide *statutory safeguards*, such as substantial guard rails at each end of culverts, as required by R. S. 68-1110, constitutes a *defect as a matter of law*." (131 Kan. at 346. Emphasis added.)

On the other hand, in *Snyder v. Pottowatomie County Comm'rs.*, supra, a county road made a sharp curve as it went up a grade and over a railroad crossing. Plaintiff's car failed to negotiate the curve at night while traveling at a reasonable rate of speed, and went over the embankment. The jury found the road defective because the curve and embankment had "[n]o guard rail or warning signs." This court affirmed, saying, "While plaintiff and the driver could have

seen the turn in the road before reaching it (finding 11), there was nothing to warn them that unless they turned sharply they would be trapped by the embankment; and the defect in the highway lay, not in the condition of the traveled portion of the way, which was wide enough (findings 13 and 17), but in the absence of a guard rail or warning sign." (120 Kan. at 661.) In that case it was not a statutory duty that was breached, but the creation of a situation which was hazardous to those using the highway in the exercise of due care.

The distinction made in our cases is recognized as the general rule in 40 C. J. S., *Highways,* § 262:

"The duty of maintaining barriers, railings, or other guards or signs, and the consequent liability for a failure to do so, may arise where such duty is imposed by statute, and to the extent, or under the conditions, prescribed by the statute. In the absence of such a statute, or under conditions to which the statute does not apply, the duty and liability arise only where the situation is inherently dangerous, or of such an unusual character as to mislead a traveler exercising reasonable care. . . ."

In the case at bar plaintiff initially urged in the court below that the commission had a statutory duty to erect a guardrail. In so doing plaintiff relied on the commission's manual on traffic-control devices, and attempted to bring this case within the rule of *Brown v. State Highway Commission,* supra. That portion of the manual specifically relied on had the following standard, in bold face type, relating to "Object Markings:"

"Section 2C-1 Application of Object Markings

"Physical obstructions *in or near a roadway* that constitute *serious hazards to traffic,* including installations designed for the control of traffic, *shall be adequately marked."* (Emphasis added.)

In its subsequent discussion of this marking requirement the manual observed that bridge supports are typical obstructions of this character, and went on to advise that, "In addition to markings, a guardrail should be placed in advance of solid obstructions such as bridge supports, overhead sign supports, and end posts of bridges. The purpose of the guardrail is to deflect vehicles and reduce the severity of impact. Guardrails should be painted white and may be reflectorized." This recommendation relates back to the standard itself, and applies to obstructions "in or near a roadway that constitute serious hazards to traffic."

In this court plaintiff no longer claims that this last, purely exhortatory provision amounts to a positive duty to erect guardrails at the bridge pillar in question. Certainly the comment lacks the spe-

cific and mandatory language of the stop sign standards considered in *Brown*, or of the other provisions of the manual which in fact establish marking standards. *E. g.*:

"2C-2 Objects Within the Roadway

"Obstructions in the roadway, if not illuminated, *shall* be marked with reflectorized hazard markers (sec. 2D-2)."

"In addition to the markings on the face of an obstruction in the roadway, warning of approach to the hazard *shall* be given by line markings on the pavement (sec. 2B-18)."

"2C-3 Obstructions in the Line of Traffic

"Where an obstruction lies in the direct line of traffic, it *shall* be marked whether or not it is illuminated." (Emphasis added.)

Further, the purpose of the manual is not to prescribe conditions under which guardrails are required. Its adoption, under K. S. A. 8-510, is for the purpose of making uniform a system of "traffic control devices." That term is defined in K. S. A. (now 1973) Supp. 8-501 as, "All signs, signals, markings, and devices, not inconsistent with this act, placed or erected by authority of a public body or official having jurisdiction for the purpose of regulating, warning, or guiding traffic." While guardrails might possibly be brought within this definition, as we read the manual no attempt was made to do so. What the manual requires, in the standard itself, is that obstructions "shall be adequately marked." As previously noted, the jury's answers eliminated the adequacy of the intersection's marking as an issue in this case.

Plaintiff's irrevocable retreat from a claim of statutory duty came when the trial court gave, without objection, the following instruction on the commission's duty in designing a highway:

"You are instructed that the State Highway Commission of Kansas would not be liable for damages to persons on the sole basis of errors or defects in the original design or plan of the highway in question unless the plan or design was known to said Commission to be manifestly dangerous to users of the highway.

"However, after construction of the highway, the State Highway Commission would be liable for damages resulting from a defect in the original plan where such defect is imbodied in the construction work and is permitted to remain after the State Highway Commission had the required five (5) days notice of said defect which renders the highway unsafe for the usage intended."

This instruction is taken almost verbatim from that given in *Hampton v. State Highway Commission*, supra, which we characterized as "a fair statement of the law." We there observed that the first portion of the instruction set forth the rule of *Gould v. City of Topeka*, 32 Kan. 485, 4 Pac. 822, that where the adequacy of a high-

way plan is debatable the adopting body is entitled to the benefit of the doubt, while the second portion embodies the qualification of *Klipp v. City of Hoyt,* 99 Kan. 14, 160 Pac. 1000, that liability attaches regardless of due care and good faith "if the result were actual peril to persons using the street with due care." (99 Kan. at 17, quoted in *Hampton,* 209 Kan. 565, at 572.) Even if it were not a correct statement of the law, being unobjected to here the instruction became the law of the case. *Hagood v. Hall,* 211 Kan. 46, 505 P. 2d 736; *Bonicamp v. McNeely,* 191 Kan. 225, 380 P. 2d 348; *Boucher v. Roberts,* 187 Kan. 675, 359 P. 2d 830.

In *Hampton,* in applying the instructions we approved the jury's finding of a defect because the drainage plan was "arguably adequate in theory but unarguably an unmarked water hazard in practice." (209 Kan. at 574.) The latter conclusion was based on evidence of at least five prior accidents, and of a number of near misses suffered by careful drivers including law enforcement officers, all caused solely by water collecting at the point of the alleged defect. We have no such evidence of "hazard in practice" in this case; no previous accident had ever been reported at this location in any way connected with the bridge piers. Hence there was no room for application here of the *Klipp* qualification, recognized in *Hampton,* that experience might show an apparently unobjectionable design to be unduly perilous in practice, and hence "defective."

We are left, then, with the question of whether, when the design of this intersection was adopted in 1957, it was in the words of the instruction, "manifestly dangerous to users of the highway," and was "known to said Commission" to be so. We can find nothing in the facts of this case to support an affirmative answer to this question.

It may be argued that whether an obstruction is so close to the pavement as to require a guardrail is a proper question for a jury. However, such a course would permit the jury to substitute its judgment for that of the commission in a case that is at best debatable. That is exactly what this court has always said cannot be done—the planning body is in the first instance entitled to the benefit of the doubt. *Hampton v. State Highway Commission,* supra, and cases cited therein. It would in effect inject into highway defect cases the element of "due care," an element which has been consistently excluded as having no part in determining the issue of a purely statutory liability. (See, *Dunlap v. Lawless,* supra, 192 Kan. at 688; *Payne v. State Highway Comm.,* 136 Kan. 561, 563, 16 P. 2d 509; and cases cited in each.)

It is this long-held principle that supports the instruction here, and in *Hampton,* that errors or defects in a plan produce no liability unless the design is *known* to the commission to be *manifestly* dangerous. It is therefore not enough to say that a better plan was possible, or that someone else would have done it differently. The danger inherent in the design adopted must be manifest, *i. e.,* "capable of being readily and instantly perceived by the senses and esp. by the sight: not hidden or concealed: open to view . . . capable of being easily understood or recognized at once by the mind: not obscure: obvious." (Webster's Third New International Dictionary.)

It is true, of course, that any solid object is hazardous to one who loses control of his vehicle and strikes that object at high speed. The commission has, over the years, demonstrated its awareness of this obvious fact by its continuous upgrading of its policy handbook on the design of rural highways, referred to as the "Blue Book." At the time this intersection was constructed that policy called for ten foot shoulders on "heavily traveled and high speed highways." Assuming this policy was applicable to this highway, there was substantial compliance. Cf. *Brown v. State Highway Commission,* supra, 202 Kan. at 16. Even if there had not been substantial compliance, such a failure would not constitute a defect *per se,* because the policy handbook lacks the statutory backing of the marking manual and does not have the force of law. Even if a highway design fails to meet the commission's design *policy* (as opposed to the statutory manual), it must nevertheless be either manifestly dangerous or prove hazardous in practice in order to constitute a "defect."

A later adopted policy calls for at least a thirty foot clearance on each side of a highway, but of course that policy applies only to new construction. Such later developments are wholly irrelevant when judging the adequacy of a design. See *Hampton v. State Highway Commission,* supra, 209 Kan. at 571; *Dunlap v. Lawless,* supra, and cases cited therein.

This court simply cannot say that an exposed pillar, almost ten feet from the pavement, is "manifestly" dangerous to those using the highway with due care. Certainly the persons who adopted the plan for the construction of this intersection, and of dozens of other intersections like it, did not think it so. Neither did any person who observed it, including the district highway supervisor who went by it every week. As we said in *Brown,* supra (Syl. ¶ 3):

"While a dangerous condition in a state highway may be a defect in the highway, the dangerous condition is not *per se* a defect under the statute—one creating liability. In addition to being dangerous, a condition must also be one the legislature is deemed to have intended to fall within the statute creating liability."

This court cannot believe that every exposed bridge support in the state is deemed by the legislature to be a liability producing "defect." (It may be noted that where the legislature *has* observed unguarded dangers it has spoken specifically to the subject as in the statutory guardrail cases discussed above.)

Plaintiff placed heavy reliance on a federally inspired program to upgrade the safety of the nation's highways, including those in Kansas. To this end federal moneys were made available for federally approved projects which required, as a first step, the submission of a statewide inventory of "hazardous" locations. Although reluctant to concede that it had any such locations on its highway system, in order to insure its "proper" share of the federal funds the commission did prepare and submit such an inventory for Kansas. The intersection involved here was not on that inventory.

The federal project called for such items as removal of roadside signs or replacement with break-away supports, edging, striping, "wrong-way" signing, and the installation of guardrails. It was a three year project, expected to be completed in 1969. As part of its participation, in June, 1968, the commission let a contract to place guardrails at 59 locations on I-70 in Shawnee county, including the intersection with K-4 here involved. Work on the Shawnee county I-70 project began in September, 1968, and the guardrails at this intersection were completed the following spring, some months after this accident.

This evidence was all introduced on the theory that it showed the required notice of the defect on the part of the commission. In fact, it had no probative value. There was really never much question of "notice" in this case—the commission and its agents had known all along that there were no guardrails at this intersection. The real thrust of the evidence was to show that the absence of the guardrails was recognized by the commission as hazardous, and thus defective. But, as pointed out above, changing standards and wholly laudable efforts to improve the safety of our highways does not make "defective" that which has long been considered adequate. The practical problems raised by the development of improved designs were commented on in *Dunlap v. Lawless,* supra, where 3

by 10 inch planks on an old bridge formed tracks across it. The court there said:

"This point goes to the design and construction of the bridge itself. It may be argued that if the bridge were to be built new at the present time, such tracks would not be used. But such bridges are not uncommon in Kansas. It would be an intolerable financial burden for the already hard-pressed taxpayers of a county to be required to alter or replace all steel and wood bridges of similar design simply because newer and better designs were used in the construction of bridges today." ( 192 Kan. at 689. )

In that case, had the county commissioners embarked on a long range plan to modernize all bridges so constructed, that decision would not have rendered such bridges *ipso facto* defective. Similarly, in this case the decision to upgrade the Kansas highway system did not render "defective" those portions which the program had not yet reached.

In summary, the absence of a guardrail did not contravene any legislative command, was not manifestly dangerous when the intersection was planned, and had not proved unduly hazardous for normal travel in practice. The absence of a guardrail, therefore, could not be found to be a highway defect, and the issue should not have been submitted to the jury.

Since the court holds that, as a matter of law, the lack of a guardrail did not constitute a statutory "defect," the judgment is reversed and the case is remanded with directions to enter judgment for the defendant state highway commission.

APPROVED BY THE COURT.

OWSLEY, J., dissenting: I respectfully dissent. K. S. A. 68-419 provides:

"( a ) Any person who shall without negligence on his part sustain damage by reason of . . . or defect in a state highway, . . . may recover such damages from the state. . . ."

K. S. A. 8-511 provides:

"( a ) The state highway commission shall place and maintain such traffic control devices, conforming to its manual and specifications, upon all state highways as it shall deem necessary to indicate and to carry out the provisions of this act or to regulate, warn, or guide traffic."

The State Highway Commission adopted a Manual on Uniform Traffic Control Devices for Streets and Highways in 1962 which contains the following provision:

"In addition to markings, a guardrail should be placed in advance of solid obstructions such as bridge supports, overhead sign supports, and end posts of

bridges. The purpose of the guardrail is to deflect vehicles and reduce the severity of impact. Guardrails should be painted white and may be reflectorized." (p. 147.)

The manual so adopted has the force and effect of law (*Brown v. State Highway Commission*, 202 Kan. 1, 444 P. 2d 882); therefore, the law of this state on the date of the tragic accident in this case required guardrails at this location. The obligation of the state to provide guardrails was recognized by the state in entering into a contract for the construction of guardrails several months before this accident.

In *Earnest v. State Highway Commission*, 182 Kan. 357, 320 P. 2d 847, we said:

". . . The policy of courts is to handle each case separately and either to include it in or exclude it from the operation of the statute. Where circumstances are such that an alleged defect cannot be excluded from the operation of the statute as a matter of law, it presents a proper case for a jury to determine. Without any legal foot rule by which to measure an alleged defective condition, it must be compared with general conditions and surrounding circumstances, and, in one sense of the word, the question whether a given condition constitutes a defect within the meaning of the statute is relative." (pp. 359, 360.)

Applying the relative rule to the facts in this case does not justify the conclusion of the majority of this court. I realize the wide discretionary power the rule implies, but its application must not be arbitrarily exercised. If the law of this state requires guardrails at a highway location, absence of such guardrails may constitute a defect in the highway. The majority opinion that no defect existed in this highway as a matter of law is a result of arbitrary exercise of a discretionary power.

The amount of the verdict was not questioned by the State Highway Commission and, even though substantial, it has no bearing on the issue of law before the court.

PRAGER, J., joins in the foregoing dissenting opinion.