No. 29,794.

PAULINE McGUIRE, *Appellant*, v. THE BOARD OF COUNTY COMMIS-
SIONERS OF THE COUNTY OF ELLIS, *Appellee*.

(299 Pac. 945.)

Opinion filed
June 6, 1931.

*Guy L. Hursh,* of Topeka, for the appellant.
*E. J. Malone, E. A. Rea* and *E. C. Flood,* all of Hays, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This action was brought to recover damages for the death of the husband of appellant, caused by the car he was driving going through an alleged defective bridge railing and killing him. The general verdict was for $3,750 and costs. Judgment was for defendant on account of the answers to special questions. Plaintiff appeals.

The facts are that on February 25, 1929, William McGuire drove upon the bridge in question. The road was rather slippery and icy. He did not have chains on his car. While traveling at the rate of about eight to ten miles per hour he struck the railing of the bridge which immediately gave way, allowing his Ford roadster to go over the side of the bridge and upset, instantly killing him. He left a

widow and ten children, and suit was brought by her to recover damages for his death. The jury returned a verdict for $3,750. In answer to special questions they determined that the guard rails in question were not good, sound and substantial guard rails; that McGuire was not negligent in any particular which contributed to the accident; that the bridge was not a low-water bridge; that the bridge at the time of the accident was very slippery; that McGuire did not have chains; that his car was going from eight to ten miles an hour at the time it hit the bridge rail, and that it hit the railing at an angle of approximately thirty degrees.

Question No. 2 was as follows:

"Did the chairman of the board of county commissioners of Ellis county have actual personal notice or knowledge of such defective condition at least five days before February 25, 1929?"

The jury answered that question "No."

On account of the above answer the trial court set aside the general verdict and rendered judgment for the defendant on the special findings.

Before damages can be recovered against the county on account of the defective condition of the highway the statute provides that—

"The chairman of the board of county commissioners of such county shall have had notice of such defects for at least five days prior to the time when such damage was sustained." (R. S. 68-301.)

During the trial of this case two men were called to the stand who had been chairmen of the board of county commissioners of this county. John Jacobs testified that he had been the chairman of the board for six or eight years preceding 1929, and that F. H. Atwood succeeded him. The record is not clear as to when Atwood succeeded Jacobs. Jacobs thought the change took place on January 8, 1929, but that his successor was not elected and qualified until the April meeting, although he testified at another time that he thought the change took place January 8, 1929. Mr. Atwood thought that he was made chairman of the board about January 10, 1929, and was chairman from that date until after the accident on February 25, 1929. Both these gentlemen testified quite frankly as to what knowledge each had of the condition of the guard rails of the bridge in question.

The question in this case is as to whether, in view of the undisputed evidence of these two commissioners, there was any evidence

to sustain the findings of the jury in answer to question No. 2 above quoted. This court has held that no particular notice of defect is necessary; that it is sufficient if the chairman of the board of county commissioners had actual knowledge of the defect. (*Erie Township v. Beamer,* 71 Kan. 182, 79 Pac. 1070.) We have held that it is not necessary for the chairman of the board of county commissioners to have actual knowledge of any particular hole in the bridge. (*Watkins v. Harper County,* 95 Kan. 166, 147 Pac. 822.) In view of these rules we will examine the testimony of the two chairmen of the board of county commissioners as to what knowledge they had of the actual condition of this railing. John Jacobs testified that he was familiar with the highway upon which the bridge was located and that he traveled it probably once a month; that he saw the railing down at the time of the big flood in 1928; that he gave instructions to the county engineer for it to be replaced, but he never went over the work to see how it was done; that when he crossed the bridge he would look at the railings and most of the time they were up; that every once in a while he would find the railings down. He had heard of such accidents once or twice; that he read in a paper in Los Angeles that a Mr. Fisher was killed on the same bridge; that on one occasion when he was chairman of the board, the condition of the bridge and railings was discussed before the board. He did not remember whether complaints were made to the board about the guard rails or not; that every time the rails were replaced the same metal and material were used as before. Part of his examination was as follows:

"Q. Do you know how they were fixed, how the guard rails were fastened to the bridge? A. I seen them already, but I don't know how; there is a little shoulder on the edge of the bridge probably three or four or five inches high and about six inches wide, and there is a plate fastened on that shoulder, and this particular plate is screwed on with several bolts. I don't know whether it's four or five or six. I don't know whether ⅝ or what they are, but they're pretty good size, and then there's threads on inside of these holes and the uprights are cut in threads and supposed to be screwed in there, and whether they were screwed clear in or not I don't know.

"Q. Did you ever look to see? A. Yes, sir; I did, but I don't know when."

Mr. Atwood, the other chairman, testified that he drove over this bridge almost every day for a long time prior to the accident; that he knew of the occasion of the flood washing the guard rails off

the bridge; that probably it occurred both in 1928 and 1929; that he was present when the guard rails were being repaired on this bridge. He did not think any portion of the railing on the south side had been down shortly before the McGuire accident, but he wouldn't be positive. Repairs were always made just as soon as they could work on it. He did not think very many complaints were made to the ·commission. He knew of the fact that the guard rails had been knocked down on different occasions and that it was frequent, and that such a condition ran along for some months prior to and down to the time of the McGuire accident. He never looked to see how the guard rails were fixed on the bridge, but he did know that about every year they were washed down by the flood. He had driven over the bridge many times when they were making repairs after the guard rails had been knocked down by other conveyances going by.

The determination of whether a person had actual knowledge of a condition can only be determined by an exploration of the mind of the person. And we have in this case the very best means of conducting such an exploration; the testimony of the persons themselves apparently answering questions in a rather frank manner. Here we have a condition where the guard rails had been repeatedly repaired after they had been washed away by different floods and after they had been knocked down by vehicles. Both of these men had actual knowledge of this condition. The fact that the repairs were repeatedly made from the same material and that the construction was such as was testified to by Commissioner Jacobs, together with the fact that a Ford car could crash through the railing while going at the rate of eight or ten miles an hour, is very conducive to the conclusion that these railings had not been repaired at all. They rather had been "just cobbled up." Rather than being any protection to travelers upon the bridge, these railings were an actual menace to him by conducing a feeling of safety when actually their condition did not warrant such a feeling. The evidence is uncontradicted that Commissioner Atwood and Commissioner Jacobs both knew of the condition of these railings and they both knew they were defective for many more than five days prior to the happening of the accident.

In view of what has been said we conclude that the undisputed evidence in the case did not warrant the jury in making the answer

that it did to question No. 2, and that the motion to set aside the answer to this question should have been sustained.

Appellee points out that the jury failed to answer question 17, which was as follows:

"What was the proximate cause of the McGuire car's running off. the bridge on February 25, 1929?"

And that the discharge of the jury by the court without compelling them to answer this question would entitle the appellant to a new trial merely, not a judgment, even though the court should reach the conclusion it has reached as to the answer to special question No. 2. However, the failure of the court to compel the jury to answer question 17 was not appealed from by appellee, and they cannot complain of that failure now.

The case will, therefore, be reversed with directions to set aside the answer to special question No. 2 and enter judgment for the plaintiff in the amount of the general verdict.