No. 35,129

Alice Neiswender, *Appellee,* v. The Board of County Commissioners of the County of Shawnee, *Appellant.*

(113 P. 2d 115)

Opinion filed May 10, 1941.

*Paul L. Harvey* and *Randal C. Harvey*, both of Topeka, for the appellant.

*Edward Rooney, Jacob A. Dickinson* and *Edward Rooney, Jr.,* all of Topeka, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for damages on account of a defective bridge that was a part of the county highway system in Shawnee county. Judgment was for plaintiff. Defendant appeals.

The bridge is located on the county highway system and is the means by which a great deal of the traffic from Oakland to North Topeka crosses the Kaw river. It is a steel bridge, rests on piers, is about 940 feet long and about 18 feet wide. The car which plaintiff's husband was driving ran through the guardrails on the south side of this bridge and fell into the water below. He was drowned.

The petition alleged that his car was knocked out of control by accidentally coming in contact with another car, which rendered his car temporarily out of control, causing it to strike against the south railing; the railing gave way, and the car fell into the river, and deceased was drowned. The petition alleged that the drowning was the proximate result of the bridge being defective in that the railings were made of wood, which had rotted, were split and cracked, and not fastened to the bridge adequately; that the rail posts which supported the railings were defective in that they were rotten and split, and not fastened to the bridge adequately except in most instances by rusty nails that would stand no horizontal force. The petition next alleged that the bridge was defective in that it had no wheel guards.

The answer of the defendant was a general denial.

The jury returned a verdict for plaintiff and answered certain special questions. The defendant filed a motion for judgment notwithstanding the general verdict, a motion to set aside the answers to special questions and for a new trial. They were all overruled and judgment rendered pursuant to the verdict.

The first argument made by defendant is that its motion for judgment on the answers to special questions should have been sustained because by these answers the jury found that the chairman of the board of county commissioners did not have five days' notice of the defective condition of the bridge, which the jury found was the proximate cause of the death of the deceased.

The action is brought pursuant to G. S. 1935, 68-301. It provides in part as follows:

"Any person who shall without contributing negligence on his part sustain damage by reason of any defective bridge . . . may recover such damage from the county . . . wherein such defective bridge . . . is located, . . . when the chairman of the board of county commissioners of such county shall have had notice of such defects for at least five days prior to the time when such damage was sustained . . ."

The answers to special questions, to which our attention is directed in connection with arguments, are as follows:

"1. Was the bridge in question defective in any respect, as claimed by the plaintiff? A. Yes.

"2. If you answer the foregoing question in the affirmative, then state of what such defect or defects consisted. A. Some railings and uprights for the same were split, rotten and not sufficiently anchored.

"12. When M. T. Kelsey, chairman of the board of county commissioners in 1936 and 1937 inspected the bridge, did he find any defect or defects therein? A. Yes.

"13. If you answer the last foregoing question in the affirmative, then state of what such defect or defects consisted. A. Mr. Kelsey did not make the nature of the defects known.

"14. Subsequent to such inspection of M. T. Kelsey, chairman of the board of county commissioners, (a) were any repairs made on such bridge, changing its condition; and (b) in the railing at the point where the Neiswender car left the bridge? A. (a) Yes. (b) It was not given in evidence that repairs were made at the point where the Neiswender car left the bridge."

Defendant argues that answer No. 2 acquits it of every defect except those specified in that answer. It then argues that the burden was on plaintiffs to prove that the chairman of the board of county commissioners had notice of the specific defects which the jury found to exist, and that the answer made by the jury to question No. 13 was in effect of "not proven" or "we do not know," which answers this court has held to be equivalent to a finding that the chairman did not have proper notice of the defect that was the proximate cause of the death.

In a consideration of this argument we must at the outset ascertain just what the burden of the plaintiff was as to notice to the chairman of the board. No formal notice was necessary. Proof of actual knowledge was sufficient. (*Erie Township, v. Beamer,,71 Kan.* 182, 79 Pac. 1070, also *McGuire v. Ellis County Comm'rs,* 133 Kan. 225, 299 Pac. 945.)

The next question is, of what must the chairman of the board have had notice? It will not do to stop with the statement that the chairman must have had actual. knowledge of the defect. In the case of bridges, we have held that actual knowledge of the particular hole in a bridge was not necessary (*Watkins v. Harper County,* 95 Kan. 166, 147 Pac. 822) and that actual knowledge of a particular defective place in a railing was not necessary. (*Mosier v. Butler County,* 82 Kan. 708, 109 Pac. 162, and *Trezise v. State Highway Comm.,* 150 Kan. 845, 96 P. 2d 637.)

Counsel for defendant seem to concede the above rule to be correct. They argue, however, that it was necessary that the chairman have knowledge of the defective condition set out in finding No. 2, that is, the split, rotten and insufficiently fastened railings. What this argument really amounts to is that in order to fix notice on the county the jury should have answered question No. 13 in the same language in which question No. 2 was answered.

The trouble with that argument is that it misses the point of what plaintiff was bound to prove. Question No. 13 asked what defects in the bridge the chairman found in 1936 and 1937 when he inspected the bridge. The issue really was: Did the chairman have knowledge of the defects? Not, Did he learn about them at any particular time? The confusion comes about because the plaintiff relied in part on testimony of the chairman himself as to what he learned. It is true he did not tell anybody, apparently, just what defects he discovered. The plaintiff was not limited in her proof of knowledge, however, to what the chairman testified he discovered. She had a right to use other evidence and she did introduce other evidence.

In *Watkins v. Harper County*, 95 Kan. 166, 147 Pac. 822; this court said, speaking of this question:

"Actual knowledge of the defect, like any other fact, may be established by circumstantial evidence, that is, it may be shown by a number of minor facts obtained from several witnesses and sources which are so related and linked together as to warrant the inference that the officer had actual knowledge of the defect." (p. 168.)

We are considering whether the answers to questions 1, 2, 12, 13 and 14 required a judgment for the defendant notwithstanding the general verdict. These answers would not require that unless one or more of the answers were inconsistent with the general verdict. (See *Sipult v. Land and Grain Co.*, 94 Kan. 224, 146 Pac. 329.) On the other hand, where it is possible to harmonize special findings with the general verdict, the general verdict is controlling. In *Osburn v. Railway Co.*, 75 Kan. 746, 90 Pac. 289, this court said:

"The final conclusion of a jury is expressed in their general verdict, and special findings are permitted only for the purpose of ascertaining whether the jury have considered and found the elemental ingredients which should inhere in and support their general verdict. In passing upon a motion for judgment upon special findings notwithstanding the general verdict the court is not required to reconcile inconsistent findings. It is not necessarily fatal to the general verdict that the special findings are inconsistent with one another. The question is, are they, when considered as a whole, so inconsistent with the general verdict that they cannot be harmonized with it?" (p. 747.)

(See, also, *McClain v. Railway Co.*, 89 Kan. 24, 130 Pac. 646.)

Keeping this rule in mind, we must examine the answer to question 13 again. By that answer the jury simply found that the chairman did not disclose what defects he found in this bridge when he made his inspection. The real issue was, Did the chairman have knowl-

edge of the defective condition? By its general verdict the jury found he did have. If the plaintiff had depended altogether upon what the chairman said he found on his inspection the argument of defendant would be more persuasive on this point. As a matter of fact, there was abundant evidence in addition to the testimony of the chairman. He himself testified that he crossed the bridge practically every day while he was chairman. There were some still pictures of the railing in different places. These pictures were shown to the jury and the trial court. They show a rotten, cracked condition of the railing in many places. The chairman testified that he observed the condition of the bridge as represented in these pictures. Moving pictures of men pushing on the railing at different places and pulling on it at other places were also shown to the jury. We do not have the benefit of these pictures here. The trial court had an opportunity to study them, however, and we cannot ignore them altogether here. It is true they were taken during the summer after this cause of action arose. However, the defects upon which emphasis was placed were due to the action of the weather. In this connection the trial court said:

"The photographs show the condition of the wood and railing along the bridge, indicating a condition that could only occur over a long period of time. It showed rotten ends—loose ends."

Knowledge on the part of a particular person must sometimes be established by evidence other than statements of the party himself. That is what this court had in mind when it used the language already quoted in *Watkins v. Harper County,* supra. We refer to that here, not on the question of whether the findings were supported by the evidence, but to demonstrate that there was ample ground to indicate that the jury based the finding of notice to the chairman on knowledge he gained at other times when he saw this bridge rather than when he made the inspection asked about in question No. 13.

In connection with this argument defendant refers to the first part of the answer to question No. 14, where the jury found that subsequent to the inspection by the chairman repairs were made on the bridge changing its condition. Defendant argues that the notice which the chairman must have must be of the condition of the bridge at the time of the injury, and that the notice he had in this case was as to its condition before the repairs, which the jury found changed its condition. The answer to that argument is the same as has already been set down here. It is based on the assumption that all

the knowledge gained by the chairman was what he learned at his inspection. We have demonstrated heretofore that there was sufficient proof outside the inspections to constitute proof of actual knowledge. Furthermore, the jury answered the second part of this question to the effect that there was no evidence that repairs were made at the point where the Neiswender car left the bridge. The condition of the bridge at this point was a portion, at least, of the defective condition of the bridge for a long time prior to the injury.

The next argument of defendant with which we shall deal is that judgment should have been entered for it on the answers to the special questions because they in effect find the husband of plaintiff guilty of contributory negligence. It will be remembered that the petition was drawn on the theory that the car in which Mr. Neiswender was riding collided with another car and caused him to lose control of it before it went through the railing and off the bridge.

Questions were answered by the jury bearing on this issue. They are as follows:

"3. Was Milton Bond negligent in the operation of his car at and immediately prior to its collision with the car of the deceased? A. Yes.

"4. If you answer the last preceding question in the affirmative, then state of what act or acts such negligence consisted. A. In not looking ahead as diligently as he should.

"5. Was the deceased, Robert Neiswender, guilty of negligence which contributed to his death? A. No evidence given that he was.

"8. What caused the Neiswender car to turn from its course upon the bridge? A. Collision with the Bond driven car.

"10. Where was the Neiswender car with reference to the center of the bridge, at and immediately prior to the collision with the car driven by Milton Bond? A. Right-hand side going west and near the center of the bridge.

"11. What do you find to be the cause of the collision between the car driven by the deceased and the car driven by Milton Bond? A. Either or both parties failing to seasonably turn to the right."

Defendant argues that since by its answer to question No. 10 the jury found that the Neiswender car was near the center of the bridge at the time of the collision, there were two or three feet in which he could have turned to the right and avoided the collision. In connection with this, it next argues that the finding that the cause of the collision was either or both drivers failing to seasonably turn to the right was the equivalent to a finding that both were guilty of contributory negligence. We must construe all these findings together and harmonize them with the general verdict and with each other, if possible. The jury found that at the time of the collision

the Neiswender car was on the right-hand side of the bridge. This was where it belonged. Admitting that the driver could have avoided the collision by turning to the right, if he was where he belonged just before and at the time of the collision, he had a right to assume that the Bond car would keep to the right where it belonged. It was not contributory negligence for him to continue on across the bridge on the right-hand side where he had a right to be.

The next argument of defendant is that the trial court erred in overruling its demurrer to the evidence of plaintiff. The case was tried on the theory of the rule set out in *Lincoln Township v. Koenig,* 10 Kan. App. 504, 63 Pac. 90. In that case this court said:

"When two causes combine to produce an injury to a traveler upon a highway, both of which are in their nature proximate, the one being a culpable defect in the highway and the other some occurrence for which neither party is responsible, the municipality is liable, provided the injury would not have been sustained but for such defect." (Syl. ¶ 2.)

The two causes in this case were the collision and the defective railing.

Defendant points out that under the rule as it was laid down in that case the plaintiff had the burden of proving that the injury would not have been sustained but for the defective railing. Defendant argues that witnesses for plaintiff testified on cross-examination that a car traveling at a speed of twenty miles an hour would strike a blow of 30,000 pounds against a solid substance and that even if these timbers had been new and securely fastened they would have broken on a right-angled impact. Defendant argues that the only evidence offered as to the angle at which the car struck the railing was that it was close to a right angle.

At the outset, it should be noted that since we are considering a demurrer to the evidence we must consider as one element proved the absence of a wheelguard, even though the jury did not find that to be one of the proximate causes of the injury. The defendant puts the worst possible construction on the evidence of plaintiff. In considering a demurrer to the evidence of plaintiff we shall accept her evidence as true and draw all reasonable inferences in favor of sustaining her. When the case was here before this court passed on the defendant's demurrer to the evidence and held that it was properly overruled. The question, however, of whether the plaintiff proved that the defective railing was the proximate cause of the injury was not discussed. The only questions were whether there was com-

petent evidence that the railing was defective and whether defendant did have necessary notice. (See *Neiswender v. Shawnee County Comm'rs*, 151 Kan. 574, 101 P. 2d 226.)

There was evidence that the Neiswender car was traveling at the rate of ten or twelve miles per hour just before the collision. There is a reasonable presumption that the collision slowed it up somewhat and that when Neiswender saw his car headed toward the railing he put on the brakes and slowed it down still more. The evidence as to the angle at which the car struck the railing was not such as to justify a conclusion any different than that reached by the jury that the angle was from thirty to ninety degrees. There was evidence that the planks which were used in the railing at the place where the car went through were 2 by 8's and that the span was twelve feet long.

An expert testified that the strength and resistance of a wooden bridge, such as the Sardou bridge, would require that the rail should sustain a load of 150 pounds per lineal foot applied at the top of the rail, and that the posts supporting the rail would be required to carry the accumulated load over the railing. Counsel argues that this is equal to a resistance of 1,800 pounds at least. There was evidence that the plank of which this railing was made was so rotten as to offer scarcely any resistance. That there was no wheelguard on this bridge is admitted by all parties. A wheelguard is a solid piece of timber several inches high bolted to the floor of the bridge parallel with the railing. One does not need to be an expert to know that a wheelguard would offer some resistance to the movement of a car as it approached the edge of the bridge. We have concluded that under all the surrounding facts and circumstances the question of whether this injury would have occurred but for the defective condition of this railing was a fair question for the jury under proper instructions of the court.

This disposes of all the questions in this case, the decision of which if in favor of the defendant would have required judgment for the defendant.

We shall now take up a consideration of the questions which defendant argues require a new trial.

Defendant argues first that the trial court erred in refusing to give an instruction requested. That instruction was as follows:

"If you find from the evidence that the chairman of the board of county commissioners did receive actual knowledge of the condition of the railing, such knowledge can be considered by you as binding on the defendant only in

the event that the condition of the railing did not change after the chairman's receipt of such knowledge and before the accident and death of Mr. Neiswender."

The trial court did not give this instruction, but did give one as follows:

"Under the provisions of our statutes, one of the prerequisites to maintaining an action to recover for damages sustained by reason of a defective county bridge is that the chairman of the board of county commissioners had notice of the alleged defects in said bridge for at least five days prior to the date of the claimed injury. It is not necessary, however, that there be notice of a defective condition existing at the exact spot where the injury occurs.

"If you find from the evidence that the chairman of the board of county commissioners had at least five days' notice prior to the death of Robert Neiswender of a defective condition of the bridge in question, that would constitute a compliance with the statute requiring such notice, so long as such defect remained unrepaired."

Defendant argues in this connection that it was entitled to have the jury instructed that knowledge of the defective condition of the railing on the part of the chairman would not be good if the condition of the railing changed after the time when the knowledge was obtained. This argument would be good if the proof was that the condition of the railing changed so as to render it not defective. That was not the case here. The railing was still defective after the change was made. Under such circumstances the statement at the close of the instruction the trial court gave meets the argument of defendant as to this instruction.

Defendant next argues that the trial court erred in the instructions given on proximate cause.

When this case was tried the first time (*Neiswender v. Shawnee County Comm'rs*, 151 Kan. 574, 101 P. 2d 226) the trial court instructed the jury to the general effect that if the defective condition of the bridge did nothing more than furnish a condition by which the injury was made possible and that there intervened between such defective condition and the injury a distinct cause of the injury, even though his death would not have happened except for such defective condition, then the defective condition of the bridge could not be made the basis of the plaintiff's recovery.

The trial court granted plaintiff a new trial because it was not satisfied with this instruction. On appeal the defendant contended that the instruction was correct. This court held that the instruction was not correct, and held—

"Where injury results from two or more contributing, successive and related

acts or events, all of such acts or events may constitute the proximate cause of the injury." (Syl. ¶ 1.)

This court further held as follows:

"Where two or more such acts or events together result in injury the fact that no culpability may attach to any of the parties in connection with some of such acts or events, does not relieve from liability the parties whose culpability is established as to other contributing causes." (Syl. ¶ 2.)

In the trial we are reviewing the trial court gave three instructions as to proximate cause about which defendant does not complain. The trial court also gave two instructions as follows:

"If you find that a defect or defects existed in the bridge as claimed by the plaintiff which were the proximate cause of the death of Robert Neiswender, then I instruct you that the fact that a collision may have occurred immediately prior to the time that the Neiswender car went off the bridge, would not relieve the county from its responsibility herein, provided you find that the requirements of the statute have been complied with. (No. 21½.)

"From the evidence it appears that there was a collision between the car driven by the deceased and a car driven by the witness, Milton Bond, immediately prior to the time the car of the deceased went off from the bridge.

"In this connection I instruct you that if you find that Milton Bond was negligent in the operation of his car at or immediately prior to such collision, and if you further find that the bridge was defective in any respect as charged by the plaintiff in her petition, and that the existence of those two facts combined to produce the death of Robert Neiswender, and that they were the proximate causes of his death, then I instruct you that they are jointly and severally liable therefor, and that each is liable for all damages suffered, even though the other party was equally culpable and that such culpability contributed in a greater or less degree to the death of Robert Neiswender.

"I further instruct you that where the acts of two parties concur to produce damage to a third person and one of such parties is sued therefor, he cannot interpose as a defense or excuse the conduct of the other party which concurred with his own in causing the damage for which suit is brought.

"On the other hand, if you find that the defective condition of the bridge did not concur with any negligence of the driver of the Bond car to proximately cause the death of Robert Neiswender, then the county would not be liable herein." (No. 22.)

Defendant argues that instruction 21½ did not correctly state the law because in effect it treated the question of the collision and the defective railing as though they were related causes as a matter of law, whereas the question of whether they were related causes should have been submitted to the jury. This court in the former appeal, in considering this question, stated:

"Where more than one act or event takes place, either of which might in itself have resulted in death or injury, and the two acts or events are in no

way related, but are merely successive, many cases hold that only one can be said to be the proximate cause. But that is not the situation here. The collision and the condition of the railing were directly related in the accident."

(See *Neiswender v. Shawnee County Comm'rs*, supra.)

There was no question to submit to the jury in this connection.

The defendant next argues that the trial court erred in refusing to strike out the answers to certain special questions because they were not supported by the evidence.

Our attention is first directed to questions 3 and 4. Defendant states that these two questions were as to matters that were not at issue in the case and they should not have been submitted. If this be true then it was not prejudicial error for the trial court to refuse to strike out the answers.

Defendant next calls our attention to question and answer No. 5, which is as follows:

"Was the deceased, Robert Neiswender, guilty of negligence which contributed to his death? A. No evidence given that he was."

Defendant argues that this general finding in favor of plaintiff must yield to the specific finding in answer to question No. 10, which in effect found Neiswender guilty of contributory negligence.

This argument has already been dealt with in this opinion.

Defendant next calls our attention to question and answer No. 10, as follows:

"Where was the Neiswender car with reference to the center of the bridge, at and immediately prior to the collision with the car driven by Milton Bond? A. Right-hand side going west and near the center of the bridge."

Defendant argues that there was no evidence whatever to support this finding. In connection with this argument it should be noted that this question had to do with only one of the elements of contributory negligence on the part of Neiswender. Conceding for the sake of argument that there was no evidence as to the position of the Neiswender car just before the collision, the plaintiff did not have the burden of showing that her husband was not guilty of contributory negligence. The burden to show that he was guilty was on the defendant. Hence, the fact that the jury should have answered "unproven" or "no evidence" in answer to question No. 10 does not require that this general verdict be set aside. Furthermore, Bond, in answer to a question, stated that the Neiswender car was practically on Bond's side of the bridge. This sort of an answer from Bond, together with the testimony of another witness to the

effect that Bond had stated that he did not see the Neiswender car until the instant of the collision, was no doubt what the jury had in mind when it answered that the Neiswender car was on the right-hand side and near the center of the bridge. This was sufficient evidence to sustain this answer.

This brings us to the last error urged by defendant, that its motion for a new trial should have been sustained because the verdict was a quotient verdict.

In this connection the defendant argues that the jury took one ballot, with the result that while each juror thought Mrs. Neiswender should recover, the members of the jury were not agreed as to the amount; that they then agreed that they should take another ballot, add the twelve amounts together, divide that result by twelve, and that this amount should be the verdict. This court has held that verdicts arrived at in such a manner should have been set aside and a new trial. ordered. In *Werner v. Edmiston,* 24 Kan. 147, this court said:

"It appears from the affidavit of the bailiff, the only testimony offered on the motion for a new trial, that he was present in the jury room during the deliberations of the jury, and that the amount of the verdict was ascertained and determined solely by adding the sums named by the respective jurors, and dividing the sum total by twelve. This was not done for purposes of consultation, but by distinct agreement that the result of these arithmetical processes should be the amount of the verdict, and it was immediately at the close of the calculation so written out and returned. This was error, and sufficient to compel a new trial." (p. 149.)

(See, also, *Johnson v. Husband,* 22 Kan. 277; *Ottawa v. Gilliland,* 63 Kan. 165, 65 Pac. 252; *Anderson v. Kirby,* 105 Kan. 596, 185 Pac. 894.)

To the rule announced in the above cases we still adhere. It appears that the distinguishing characteristic of a quotient verdict is that the jurors agree before the ballot is taken that the quotient would be their verdict. When the motion for a new trial in this case was heard the jurors were called to the stand and interrogated about this point. The trial court found that there had been no such agreement, and overruled the motion for a new trial. The defendant argues that the uncontradicted evidence was to the effect that there was such an agreement. This contention makes it necessary for us to examine the record of this evidence. The trial court, in the consideration of this question, quoted first from the testimony of the foreman of the jury. It was as follows:

"A. After we put that down we had an agreement to arrive at what you would say was an equity of the judgment in taking the average, is how the $6,300 was arrived at.

"Q. After you got what each juror thought should be awarded Mrs. Neiswender, what did you do with those different amounts? A. Divided them.

"Q. After you got the amounts, what did you do with them; add them and divide them? A. Yes, sir.

"Q. By what? A. By twelve.

"Q. And before you did that, you agreed that that would be your verdict? A. Yes, sir."

After quoting the above testimony, the trial court remarked in a memorandum decision that this testimony would incline one to the belief that the verdict was a quotient verdict.

The trial court then referred to a portion of the cross-examination of the foreman to the same general effect and remarked that there was a divergence of opinion among the jurors as to whether there was an agreement that the quotient should be the verdict and found as a matter of fact that there was no such an agreement.

We have carefully examined the testimony of all the jurors and can find no such divergence.

In a supplemental brief, in dealing with this question, counsel for plaintiff quotes the testimony of one of the jurors, as follows:

"Q. I wish you would tell the court how that amount of $6,300 was arrived at. A. We all twelve took a ballot, each one putting down our own figure, what we thought. They were added together and divided by twelve, which came to $6,333. Then we discussed about cutting off the odd dollars and making it even money. Then they took another ballot—$6,300 or $6,500—because six would have $6,300 and six would have $6,500. That was before dinner, and after dinner for a couple of hours, and then we had a third ballot and we were all unanimous for $6,300; because they could not agree first on the $6,300 or the $6,500.

"THE COURT: Was that last ballot you referred to in writing or oral?

"THE WITNESS: It was in writing, and then Mr. Porterfield put us on the spot and asked us each individually if we were satisfied.

"Q. There were three ballots? A. Three ballots. The first was for an average, and it came to $6,333, I remember very distinctly, and the second was for $6,300 or $6,500—striking off the odd figures—and there was six each for $6,300 and $6,500; and the third ballot for $6,300 was unanimous.

"Q. When the foreman questioned you, did you indicate that was the amount of your verdict? A. Yes, sir; each and every one of them did."

Counsel argues that this testimony is to the effect that there was no agreement that the quotient should be the verdict. About all this testimony does is show that there was a discussion in the jury room as to whether the amount would be "even hundreds." The evidence

was all to the effect, however, that there was an agreement that the jury would take a ballot and the twelve amounts together divided by twelve would be the verdict. We have therefore concluded that the motion for a new trial should have been sustained on this ground.

The judgment of the trial court is reversed with directions to grant defendant a new trial.

HARVEY, J., not sitting.