No. 42,946

Donald A. Noblit, a minor, by Donald E. Noblit, his father, natural guardian and next friend, *Appellee*, v. The Board of County Commissioners of The County of Sedgwick County, Kansas, *Appellant.*

(376 P. 2d 872)

Opinion filed December 8, 1962.

*Ralph E. Gilchrist,* of Wichita, argued the cause, and *H. Jay Setter,* also of Wichita, was with him on the briefs for the appellant.

*Gerald L. Michaud,* of Wichita, argued the cause, and *Lewin E. Timmerman, Russell Cranmer* and *M. William Syrios,* all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a damage action for bodily injuries alleged by the plaintiff to have been sustained by him while riding in an automobile on a county bridge. The jury found the bridge to be defective and returned a verdict for the plaintiff in the sum of $58,000. Appeal has been duly perfected by the defendant from the judgment and various rulings of the trial court.

The numerous specifications of error present four underlying questions. They are:

(1) Was the county bridge defective within the meaning of G. S. 1949, 68-301?

(2) If defective, was the defective condition of the bridge a direct or proximate cause of plaintiff's injuries?

(3) Did any member of the board of county commissioners, the county engineer, or the superintendent of roads and bridges have notice of such defects, if any, for at least five days prior to the time when plaintiff's injuries occurred?

(4) Was the verdict excessive?

The first two questions were raised by the appellant on a motion for judgment on the pleadings and the plaintiff's opening statement, on a demurrer to the plaintiff's evidence, on the admission of evidence and in the giving and refusing to give certain instructions. All questions were raised on the motion for a new trial. The appellant contends the first three questions should be answered in the negative and, if it fails on these points, that the verdict was excessive.

The facts giving rise to this action are as follows:

On November 27, 1959, at approximately 8:30 o'clock in the morning, the Noblit family, consisting of Mr. and Mrs. Donald E. Noblit, their children, Donald A. Noblit, six years of age (plaintiff-appellee), and Joyce Noblit, three years of age, was involved in a tragic accident on a bridge built and maintained by the defendant (appellant) over the Big Arkansas River in Sedgwick County, Kansas. The road and bridge are a part of one of the principal thorough-

fares connecting the Boeing Airplane Company's plants to the city of Wichita. It is known as the McArthur Road.

The Noblit family had departed from their residence about ten minutes before arriving at the site of the tragedy. They were embarked on a post-Thanksgiving holiday with friends in Leavenworth. The day was cold but the roads were clear and dry, and Mr. Noblit was driving well within the speed limit. As he approached the bridge across the Arkansas River, just east of the city limits of Wichita, he observed a truck, which had been preceding his automobile for some distance and about six car lengths ahead, suddenly swerve to the left and then back to the right side of the bridge. The truck then either stopped or practically stopped directly in the path of Noblit's 1954 Chevrolet automobile. Mr. Noblit immediately realized the roadway over the bridge was covered with ice or frost and was extremely slick. He proceeded to do the only thing he could under the circumstances by removing his foot from the accelerator. He applied the brakes gently in order to reduce his speed without throwing the vehicle into an uncontrollable skid. Nevertheless, he was still approaching the rear of the truck, and to avoid colliding with it he turned into the left-hand traffic lane. As the car started to move to the left, the steering wheel gave a violent jerk and the automobile continued to move at an angle and out of control despite anything Mr. Noblit could do. Recognizing the danger, he set the brakes hard for an instant hoping to swing his car back to the right; he turned the steering wheel over and back again trying to get traction, but still nothing happened. It seemed to Mr. Noblit that everything was occurring in slow motion; he could see the bridge railing coming at him but he was helpless. In his opinion his speed at that time was between five to seven miles per hour. It did not seem as though there was a crash or jolt— although he realized there probably was—and the car went out and over the edge of the bridge, teetering for a moment, then plunged into the river twenty-four feet below. It overturned as it struck the water and settled to the bottom, coming to rest on its right, or passenger side. The water at the place where the automobile was submerged was about four and one-half or five feet deep.

At the time the Noblit automobile plunged into the river Mrs. Noblit was in the front seat on the right, the plaintiff (appellee) was in the rear seat on the left with his sister, Joyce, who was on the right side. Mr. Noblit, while under water, attempted to open the

car door. He pulled on the handle so violently that it broke off. He then kicked it open. All the time he could hear his daughter screaming, and he was able to pull her out of the rear seat and place her on the side of the car above the water. He then dove back in to try to get the plaintiff out. Mr. Noblit finally found the plaintiff who was not moving or crying and who seemed to be unconscious. He pulled the child's head over the front seat and pounded on his back. Eventually, the boy gasped and started breathing again. The father held the boy's head above the water and tried to extricate him from the back seat. At the same time, Mr. Noblit was trying to locate his wife. He felt her body but found no movement, and realized he could do nothing for her.

Two servicemen stationed at McConnell Air Base near Wichita arrived at the scene shortly after the accident and waded into the icy river to Noblit's assistance.

The action in this case is brought pursuant to G. S. 1949, 68-301. It provides in part as follows:

"Any person who shall without contributing negligence on his part sustain damage by reason of any defective bridge, . . . may recover such damage from the county . . . wherein such defective bridge, . . . is located, . . . when such damage was caused by a defective bridge, . . . which by law, . . . the county is obligated to maintain, and when any member of the board of county commissioners, the county engineer or superintendent of roads and bridges of such county shall have had notice of such defects for at least five days prior to the time when such damage was sustained; . . ."

The appellant contends the amended petition does not state facts sufficient to constitute a cause of action because it does not allege that any defect or defects in the bridge contributed to, or were a proximate cause of, any injury or damage sustained by the plaintiff. This point is first raised by specifying as error the adverse ruling of the trial court on the appellant's motion for judgment on the pleadings and the opening statement. The appellant makes no contention regarding the opening statement.

A motion for judgment on the pleadings invokes the judgment of the trial court on questions of law as applied to the well-pleaded and conceded facts. It presupposes a lack of issue of fact. Such motion admits the truth of all well-pleaded facts in the pleadings of the opposing party, and under the circumstances presented by this record, it may be considered equivalent to a demurrer. (*Geier v. Eagle-Cherokee Coal Mining Co.*, 181 Kan. 567, 313 P. 2d 731; *Dearborn Motors Credit Corporation v. Neel*, 184 Kan. 437, 337 P.

2d 992; and see *Thompson v. Morris County Comm'rs,* 170 Kan. 74, 223 P. 2d 749.)

The pleading under attack is the plaintiff's amended petition, the material portion of which reads as follows:

"IV.

"At said time and place, the defendant was negligent in allowing the Mc-Arthur Road Bridge to exist and to be used as a portion of a public county highway while it was defective in the following respects:

"1. The asphalt surface of said bridge was worn, pitted and full of large holes, thereby creating a hazard for the vehicles of the public in general, and especially the vehicle in which plaintiff was riding, when using said bridge to cross the Big Arkansas River.

"2. The railings and rail posts of said bridge were made of wood which had rotted with the years of weather, was split and cracked.

"3. The rail posts on said bridge which support the railings were defective in that they were not fastened to the bridge by steel bands or any other type of support except iron bolts which were inserted horizontally through the rotten wood rail posts and in many instances, said rail posts were approximately 6½ feet to 7 feet apart, thereby causing said railings and rail posts to give insufficient support to the vehicles of the public in general, and especially the vehicle in which this plaintiff was a passenger, when they came in contact with said railings and rail posts and thereby causing said vehicles, and especially the vehicle in which this plaintiff was a passenger, to go into the Big Arkansas River.

"4. Said bridge did not have adequate wheel guards of sufficient height, width or design to prevent the vehicles using said bridge, and especially the vehicle in which plaintiff was a passenger, from going off of said bridge and through the wood railings into the Big Arkansas River.

"The injuries and damages to plaintiff hereinafter set forth were proximately caused by such negligence of defendant as aforesaid."

It is the appellant's contention that none of the enumerated defects above alleged constitutes a defect in the bridge within the meaning and intent of the statute (68-301, *supra*). The appellant argues the statute enacted in 1917 (R. S. 1923, 68-1110) requiring the county board to place and maintain at all times good, solid, substantial guardrails, not less than three feet high on each side of all bridges, was expressly repealed by Laws of 1935, Chapter 250. *Sell v. McPherson Township,* 152 Kan. 731, 107 P. 2d 670; and *Thompson v. Morris County Comm'rs,* supra, are cited by the appellant as an expression of the court on this subject.

The appellant argues that inasmuch as the appellee based his cause of action upon a statutory requirement that no longer exists—the liability of the county being purely statutory—the appellee failed to state a cause of action. The appellant's attempt, however,

to explain away the allegation that "The asphalt surface of said bridge was worn, pitted and full of large holes, thereby creating a hazard" is not impressive. This allegation would be sufficient, in and of itself, without reference to other allegations pertaining to the defective condition of the railings, rail posts and wheel guards, which the appellant asserts are not within the purview of the statute.

In *Gorges v. State Highway Comm.*, 135 Kan. 371, 10 P. 2d 834, the court said:

"No general definition of the term 'defect in a highway' appears to have been made by this court, nor do we find any such general definition in the decisions of the court of other states with similar or identical statutes. This for the very good reason that it is very difficult, if not impossible, to formulate a general definition which meets the intricate circumstances arising out of our modern highways and means of travel. The policy adopted by the courts has been to handle each case as it is presented, and to either include it in or exclude it from the operation of the statute. . . ." (p. 373.)

In *Williams v. State Highway Comm.*, 134 Kan. 810, 8 P. 2d 946, the claimed defects were holes in the highway and the question concerning defects was considered. The court said:

"A condition of a highway which renders it dangerous for the public traveling over it is certainly a defect. . . ." (p. 813.)

The foregoing statement is cited with approval in subsequent decisions. (*Thompson v. Morris County Comm'rs*, 170 Kan. 74, 77, 223 P. 2d 749, and cases cited therein.)

The cases cited and relied upon by the appellant involved a bridge or culvert constructed without guardrails, and it was held that the failure of the township or county to construct such guardrails was not a breach of any statutory requirements in view of the repeal of G. S. 1935, 68-1110. Another similar case, though not cited by the appellant, is *Wilson v. Barber County Comm'rs*, 154 Kan. 525, 119 P. 2d 502, which followed *Sell v. McPherson Township*, supra.

Here a different situation is presented. Where guardrails and wheel guards were installed on the bridge they become an integral part of the structure, and if damage is sustained as a consequence of a defect in the bridge, or any part thereof, the injured person may recover his damages from the county or township, assuming no other bar to recovery is present. A case of this type is presented in *Neiswender v. Shawnee County Comm'rs*, 153 Kan. 634, 113 P. 2d 115, decided shortly after the *Sell* case and before the *Wilson* case. There the petition alleged that the automobile driven by the dece-

dent was knocked out of control by accidentally coming in contact with another automobile, which threw it temporarily out of control, causing it to strike against the guardrailing of the bridge; the railing gave way, and the automobile fell into the river and the driver was drowned. The petition alleged that the drowning was the proximate result of the bridge being defective in that the railings were made of wood, which had rotted, were split and cracked, and not fastened to the bridge adequately; that the rail posts which supported the railings were defective in that they were rotten and split, and not fastened to the bridge adequately except in most instances by rusty nails that would stand no horizontal force. The petition next alleged that the bridge was defective in that it had no wheel guards.

The action was there brought pursuant to G. S. 1935, 68-301. The jury returned a verdict for the plaintiff and the defendant appealed. On appeal it was said:

". . . There was evidence that the plank of which this railing was made was so rotten as to offer scarcely any resistance. That there was no wheelguard on this bridge is admitted by all parties. A wheelguard is a solid piece of timber several inches high bolted to the floor of the bridge parallel with the railing. One does not need to be an expert to know that a wheelguard would offer some resistance to the movement of a car as it approached the edge of the bridge. We have concluded that under all the surrounding facts and circumstances the question of whether this injury would have occurred but for the defective condition of this railing was a fair question for the jury under proper instructions of the court." (p. 642.)

While the *Neiswender* case made no reference to the repeal of G. S. 1935, 68-1110, by the Laws of 1935, Chapter 250, it is clear the court considered that defective guardrails installed and in place on a bridge constituted a defect in the bridge within the purview of 68-301, *supra*.

We have little difficulty concluding that the amended petition sufficiently stated a cause of action under 68-301, *supra*.

The appellant in its demurrer to the evidence of the appellee raised substantially the same questions as those heretofore considered.

At the trial Mr. Noblit testified on cross examination that he hit a rough spot when his automobile started to slide; that he did not go back and check the exact area either way. "I just know that when I came upon the spot and turned the wheel, it suddenly grabbed. It could have been caused by a soft place, a hard place, a

hole in the bridge. Not the ice. It would slide on the ice, but not suddenly grab. It would just have a slick surface. After I started in the angling direction that eventually hit the bridge railing, I think I put my brakes on momentarily to try and stop the angle of attack toward the bridge railing."

Sergeant Luther T. McFarland, U. S. A. F., one of the servicemen who came to Noblit's assistance in the river, testified that he had traversed the bridge five days a week for five years before the Noblit automobile went into the river. He said at the point where the Noblit automobile began to skid the surface of the roadway was rough—it had been rough for the past five years compared to what would be a reasonable roadway in his opinion; that the wood railings were poor, they were not painted; the wheel guards were wood and on occasion there was sand along the wheel guards. Through photographs admitted in evidence he identified the portion of the railing through which the Noblit automobile entered the river and he said it was rotted.

Other witnesses familiar with the McArthur Road bridge described the surface of the bridge as rough and washboardy; that the remaining railing at the point where the Noblit automobile left the bridge appeared to be "dry rotted;" that drains below the wheel guards were not apparent in photographs taken from the surface of the bridge but were apparent from the opposite side, thus indicating that instead of a ten-inch wheel guard as the bridge was constructed, the height of the wheel guard was merely five inches above the surface of the roadway and the debris which had accumulated thereon. Other testimony established that the bridge surface had holes and deep grooves in it; that the rails were weather-beaten and appeared insecure. Numerous photographic exhibits substantiated the foregoing testimony. These photographs were said by witnesses to portray the condition of the bridge at the time of the accident.

A civil engineer inspected the bridge and testified that in his opinion on November 27, 1959, the effectiveness of the hub or wheel guards in the bridge in question was reduced by reason of the accumulation of debris in the drains, and that the full ten inches of wheel guard as originally designed was reduced by reason of the accumulation of debris; that the guard, as originally installed, would have prevented a 1954 Chevrolet traveling between five and ten miles per hour and striking the wheel guardrail at an angle of forty-five degrees from going off the bridge. Based upon the assumed

facts in evidence and his inspection of the bridge, it was his opinion that the bridge in question was not in a reasonably safe condition on the date of the accident in question.

While the appellant concedes there were rough spots on the blacktop surface of the bridge, it contends there was no evidence as to the particular location of any of said rough spots. When the entire record is examined, including the photographs admitted in evidence, the foregoing contention is without merit.

The jury found in answer to special questions the bridge was defective within the meaning of the law, and in stating of what such defects consisted, answered: "The road surface is excessively rough from cracks and holes, and collection of considerable debris exhibits inadequate maintenance. The hub-guard is of inadequate height and the railing is extremely rotted in most areas." They also found the defective condition of the bridge was a direct or proximate cause of the appellee's injuries.

These findings by the jury were supported by the evidence under proper instructions given by the court as to the law in the case.

The appellant contends there was no evidence that any member of the board of county commissioners, or the county engineer or the superintendent of roads and bridges in Sedgwick County, had any knowledge of any defect in the bridge at any time prior to the accident which resulted in the appellee's alleged injuries on the 27th day of November, 1959.

It has long been the rule that the notice required by G. S. 1949, 68-301, need not be formal. Proof of actual knowledge is sufficient. (*Erie Township v. Beamer,* 71 Kan. 182, 79 Pac. 1070; *McGuire v. Ellis County Comm'rs.,* 133 Kan. 225, 299 Pac. 945; and *Neiswender v. Shawnee County Comm'rs,* supra.)

In *Watkins v. Harper County,* 95 Kan. 166, 147 Pac. 822, it was said:

". . . Actual knowledge of the defect, like any other fact, may be established by circumstantial evidence, that is, it may be shown by a number of minor facts obtained from several witnesses and sources which are so related and linked together as to warrant the inference that the officer had actual knowledge of the defect. . . ." (p. 168.)

Mr. Fisher, a member of the board of county commissioners of Sedgwick County, testified that he was aware of the McArthur Road bridge during his entire tenure of office, from 1957 to and including November 27, 1959. He crossed the bridge at least three times a week and he said he was aware of the condition of the bridge, *what-*

*ever it was,* through the year 1959; that he knew of the wooden railings and wheel guards, as well as the surface; and that he was at the bridge on the morning of November 27, 1959. One of the appellee's photographic exhibits was described by him as a fair representation of how the bridge appeared on that date, and was said to correctly and generally portray the condition of the bridge as he observed it throughout the year. He said, "Whatever the conditions were, I was aware of them at that time."

The appellant relies upon the following question and answer of Mr. Fisher:

"Q. Mr. Fisher, during the year, 1959, or anytime prior thereto, did you have notice or knowledge of any defects in the McArthur Street Bridge?

. . . . . . . . . . .

"A. Not that I recall."

The foregoing answer was given over the objection of counsel for the appellee on the ground that it called for a conclusion.

Mr. Fisher did, however, admit in his testimony that an engineer was employed by the county commissioners of Sedgwick County to make a study of the bridge; that he was aware of the study made by this engineer as to the inadequacy of the road. The report also included the replacement of the McArthur Road bridge with a new bridge. The road was to be changed into a four-lane road.

It is observed that Mr. Fisher did not deny that he had notice or knowledge of any defects in the McArthur Road bridge; he merely did not recall notice or knowledge, although he had previously testified that he was familiar with whatever conditions were shown in several photographs of the bridge. Other witnesses identified these exhibits and saw the defects as shown in the exhibits, which were fair representations of the condition of the road surface on the bridge as it existed for several years prior to November 27, 1959.

This circumstantial evidence that Mr. Fisher had actual notice of the defective condition of the bridge for at least five days preceding the accident was sufficient to sustain the jury's affirmative finding on this point made in answer to a special question.

A similar situation was presented in *Neiswender v. Shawnee County Comm'rs,* 153 Kan. 634, 113 P. 2d 115, where the court said:

". . . As a matter of fact, there was abundant evidence in addition to the testimony of the chairman. He himself testified that he crossed the bridge practically every day while he was chairman. There were some still pictures of the railing in different places. These pictures were shown to the jury and the trial court. They show a rotten, cracked condition of the railing in many

places. The chairman testified that he observed the condition of the bridge as represented in these pictures. . . .

"Knowledge on the part of a particular person must sometimes be established by evidence other than statements of the party himself. That is what this court had in mind when it used the language already quoted in *Watkins v. Harper County,* supra. We refer to that here, not on the question of whether the findings were supported by the evidence, but to demonstrate that there was ample ground· to indicate that the jury based the finding of notice to the chairman on knowledge he gained at other times when he saw this bridge . . ." (p. 639.)

Although assigned as error by the appellant, instruction No. 7 given by the court properly instructed the jury as to the law on this point when considered in connection with other instructions given and the evidence adduced in the case.

The appellant contends the verdict and the judgment rendered pursuant thereto are grossly excessive in amount. The verdict in this case was for $58,000 and judgment was entered for this amount.

The appellee in this case was partially submerged in icy water for twenty minutes or more. Dr. Hervey S. Hodson saw the appellee on the date of the accident and fifteen minutes after his admission to the hospital his temperature was 87 degrees. Subsequently his temperature rose to 104.6 degrees. The appellee also sustained a fracture of both bones in his left forearm, near the wrist. A closed reduction was unsatisfactory and another reduction was required. A permanent shortening of the arm resulted, although good function was obtained.

Doctor Hodson testified that the radically lowered body temperature of the appellee had a deleterious effect on his brain cells. He said there was no question but what the appellee had some brain damage and that brain cells do not regenerate. He further testified that it was medically impossible to determine what the final result would be. Numerous witnesses who knew the appellee before and after the accident testified as to the change in the appellee's personality and mentality. The general effect of their testimony was that prior to the appellee's injuries he was an exceptionally alert, responsive child, but that subsequent to the injuries he had undergone a definite personality change; that he was mentally on the slow side and physically awkward.

The appellant does not argue that the verdict was the result of bias or prejudice on the part of the jury. Its only complaint is that it is "excessive." The appellant offered no testimony on the issue of

damages but relies wholly on matters developed on cross examination of the appellee's witnesses. No special questions were submitted with reference to the injuries and damages, and the verdict was not itemized as to elements of damages.

Under these circumstances the appellee is entitled to a favorable review of the evidence. This was the situation in *Knoche v. Meyer Sanitary Milk Co.,* 177 Kan. 423, 280 P. 2d 605, where the court said:

> "A full and careful examination of the record pertaining thereto convinces us that taking into consideration the age of the appellee, her expectancy in life, . . . the nature of her injuries and their permanence, and the pain and suffering which she has endured . . . and considering amounts of verdicts for somewhat comparable injuries, heretofore approved, in the light of increased cost of living or the impaired purchasing power of money, it may not be said the amount of the verdict, even though it is for a substantial amount, is such as to shock the conscience of the court or that it should be set aside as unfounded by the evidence or as excessive. . . ." (pp. 437, 438.)

Similarly, we cannot say in the instant case that the verdict in favor of this six-year-old child is such as to shock the conscience of the court, or that it should be set aside as unfounded by the evidence or as excessive.

Other specifications of error assigned by the appellant which relate to the giving or refusing to give instructions, and objections to the evidence relate directly to the appellant's legal theory of this case which has heretofore been considered and determined adversely to the appellant.

It may be conceded the provisions of 68-301, *supra,* do not require the maintenance of a perfect bridge (*Hill v. State Highway Comm.,* 143 Kan. 129, 53 P. 2d 882; and *Sheen v. State Highway Commission,* 173 Kan. 491, 249 P. 2d 934), but the allegations of the amended petition and the evidence in this case, in our opinion, were sufficient to present a question for the jury to determine whether the bridge was defective, and, if so, whether such defective condition was the proximate cause of the appellee's injuries.

Other points raised by the appellant have not been overlooked, but after careful review they either have no merit or do not affirmatively appear to have prejudicially affected the substantial rights of the appellant. (G. S. 1949, 60-3317.)

The judgment of the lower court is affirmed.